**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No.: 9:23-CV-81420-RLR

SEMPER FOODS, LLC,

      Plaintiff,

v.

ERIC OUELLETTE,

      Defendant.

_____/

**MOTION FOR PRELIMINARY INJUNCTION**
**AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff, Semper Foods, LLC ("**Semper Foods**"), through undersigned counsel, pursuant to Federal Rule of Civil Procedure, and based upon the Verified Complaint ("**Compl.**") filed simultaneously herewith, serves this Motion for Preliminary Injunction and Incorporated Memorandum of Law seeking a preliminary injunction against Defendant, Eric Ouellette ("**Ouellette**"), and states:

## I.  <u>INTRODUCTION</u>

Ouellette—one of Semper Foods' founders and its former Chief Operating Officer—is working for Semper Foods' direct competitor in violation of valid restrictive covenants *contained in Semper Foods' Operating Agreement* and will not stop. This Court should issue a preliminary injunction preventing his continued violations for the reasons set forth below.

## II.  <u>VERIFIED FACTS</u>

### A.  <u>Semper Foods' Formation and its Business.</u>

Andrew Geller ("**Geller**"), Jency Lopez ("**Lopez**"), and Ouellette collectively founded Semper Foods in 2018. Compl. at ¶7. Initially, Geller owned a one-third interest in Semper Food

through his company,  Lion Distribution & Trading, LLC ("**LTD**"); Lopez owned a one-third interest through his company, Sixten Consultants, LLC ("**Sixten**"); and Ouellette owned a one-third interest through his company, Semper Consulting, LLC ("**Semper Consulting**") (together with LTD and Sixten, the "**Members**") owned a one-third interest. *Id.* at ¶8.  On February 1, 2018, the Members entered into the Operating Agreement of Semper Foods, LLC (the "**Operating Agreement**").  *Id.* at ¶9, Ex. "A."

Semper Foods is a specialized broker and distributor of wholesale protein foodstuffs (chicken breasts, ground beef, etc.) and dry-good food products operating throughout the United States.  *Id.* at ¶10. Its customers include nationwide wholesalers, national food processors and food brands, food banks, correctional institutions, governmental institutions, universities, and educational systems.  *Id.* at ¶11. The company has established itself as a leading purveyor of quality protein and dry-good food products and related services nationwide.  *Id.* at ¶12.

In doing so, Semper Foods has developed valuable customer lists, substantial, ongoing customer relationships, and related confidential and proprietary information through a significant investment of time, manpower, and financial resources aimed at relationship building, along with years of trial and error. *Id.* at ¶13. Its customer relationships involve ongoing and repeat sales and orders; and it generally sources and provides the same or similar products and services to its customers month after month. *Id.*  at ¶14. Similarly, Semper Foods has expended significant financial and human capital to build and maintain its nationwide supplier and vendor network, which it leverages to source and sell high quality food products to its customers at competitive prices. *Id.* at ¶15.

The company's customer, supplier, and vendor information, including without limitation supplier capabilities, past, present, and future customer needs and purchases, related pricing,

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

financial information, strategies, and techniques, are hard-earned, extremely valuable trade secrets and confidential information that Semper Foods carefully guards against competitors, and that provide the company with a current and future competitive advantage in the marketplace. *Id.* at ¶16. Semper Foods' confidential and proprietary business information derives independent economic value from not being generally known or readily ascertainable through proper means by the public, and provides Semper Foods with a competitive edge in the marketplace. *Id.* at ¶¶17-18.

   **B.   Relevant Terms in Semper Foods' Operating Agreement.**

   To protect its proprietary business model, its customer and pricing information, customer relationships, its goodwill and other confidential and trade secret information, the Members agreed in the Operating Agreement to certain restrictions and covenants during the course of their ownership and management of the company and for a reasonable time thereafter (the "**Operating Agreement**"). *See* Compl. at ¶19, Ex. "A."

   In Article XI(A), the Members agreed that, during the period that a Member or Authorized LLC Member Representatives[1] (as defined in the Operating Agreement) owns or controls an ownership interest in Semper Foods and for the eighteen (18) month period commencing the day immediately following the date on which such Member or Authorized LLC Member Representative's ownership interest or control thereof terminates (the "**Exclusionary Period**"), no Member or Authorized Member Representative (including Ouellette) may "directly or indirectly (a) own, invest, manage, operate, control or participate in any manner in the ownership, management, operation or control of any entity, (b) serve as a partner, equity holder, employee, principal, agent, or otherwise with any person or entity, or (c) have any financial interest in or

---

[1] Semper Consulting's Authorized LLC Member Representative was Ouellette. *See id.* at p. 4 n. 1, Ex. "A" at p. 2.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

relationship with any person or entity, that directly competes with the Company's principal business operations as a food broker (a "Competing Activity") anywhere in the United States." *Id.* at ¶20, Ex. "A" at pp. 14-15.

Ouellette accordingly agreed that "during the exclusionary period the Member or Authorized LLC Member Representative shall promptly notify the President of the Company … in advance in writing (which shall include a description of the activity) of the Member or Authorized LLC Member Representative's intention to engage in any activity which could reasonably be deemed to be subject to the noncompetition provision. . ." *Id.* at ¶22, Ex. "A" at p. 15.

He further agreed in Article XI(B) during the Exclusionary Period not to "directly or indirectly … solicit any of the Company's customers or suppliers who transacted any business with the Company within twelve (12) months prior to the Termination Date (as defined in the Operating Agreement) to engage in any transaction for the sale or purchase of any product or service provided by the Company." *Id.* at ¶22, Ex. "A" at p. 15. Ouellette similarly agreed in Article XI(C) not to "disclose or use any trade secret, proprietary or confidential information of the Company" except in relation to performance of his services to Semper Foods. *Id.* at ¶23, Ex. "A" at p. 15.

In addition to the foregoing restrictive covenants, the Members (including Ouellette) agreed in Article VIII(D) that any Member may be expelled from the company and an Officer may be removed from office for "cause." *Id.* at ¶24, Ex. "A" at p. 7. "Cause" includes without limitation the "commission of an act of fraud, theft or dishonesty against the Company[;]" or a "violation of the Non-Compete Provisions" of the Operating Agreement. *Id.* at ¶25, Ex. "A" at p. 7. To the extent a Member is expelled for "Cause," the other two Members may elect by unanimous consent

4

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

"to have the Company purchase the expelled Member's Membership Units by paying the expelled Member the balance of the expelled Member's Capital Account as reflected on the Company's Records as of the date of expulsion," at which point the expelled Member's Membership Units shall then be allocated among the remaining Members. . ." *Id.* at ¶26, Ex. "A" at p. 7.

### C. **Ouellette's Role with Semper Foods.**

Ouellette co-founded Semper Foods and served as its Chief Operating Officer and Second Vice President from the date of the company's organization through April 3, 2023. Compl. at ¶28. He accordingly owed certain statutory and contractual fiduciary duties to Semper Foods. *Id.* at ¶29. In his role as co-founder, Second Vince President, and Chief Operating Officer, Ouellette held the veritable keys to the kingdom—unfettered access to the highest levels of Semper Foods' competitive, non-public confidential, proprietary, and trade secret information critical to the company's business. *Id.* at ¶30. This information includes, but is not limited to, Semper Foods' entire business model and growth plans, specific identities and contact information for clients, suppliers, and vendors, their purchase histories and future purchasing needs, highly confidential pricing information, other financial information, pricing strategies and margins, as well as other valuable, confidential information crucial to servicing and retaining Semper Foods' customers, maintaining sales, maintaining the company's goodwill and market share. *Id.* at ¶31.

Ouellette also had access to other proprietary and confidential information entrusted to Semper Foods directly by its customers, suppliers, and vendors; as well as with privileged access to Semper Foods' secure, password-protected sales database containing vast amounts of highly-sensitive customer information. *Id.* at ¶¶32-33.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

**D.  Semper Foods Implements and Maintains Comprehensive Policies and Measures to Protect Its Confidential and Sensitive Information.**

Semper Foods invested substantial time and resources maintaining the client lists and the aforementioned confidential and proprietary information. *See* Compl. at ¶34. In addition to requiring Ouellette to enter into certain restrictive covenants, Semper Foods instituted numerous other measures to protect its confidential and proprietary information and trade secrets. *Id.* at ¶35.

It relies on robust security measures, including confidentiality agreements, employee trainings, and technological measures, to protect its valuable trade secrets and proprietary and confidential information. *Id.* at ¶36. For example, employees are required to sign Non-Disclosure and Non-Solicitation Agreements as a condition of employment. *Id.*

Semper Foods utilizes industry best practices to protect its computer network, where most of its proprietary, trade secrets and confidential information are stored. *Id.* at ¶¶37-38. It also employs a host of security software to monitor and protect its proprietary, confidential and trade secret information. *Id.* at ¶38. Semper Foods has deployed and uses Bit Defender on all company owned devices. *Id.* It also has strict security settings in place in the Google Workspace, with administrative controls to view, monitor, and quarantine all inbound and outbound email, including using both in-bound and out-bound firewalls, network monitoring and control by its IT department, scanning software for all outbound email, antivirus software, file-share monitoring software, restricted access folders on the internal network, and data encryption. *Id.*

To access Semper Foods' systems remotely, the company requires two-factor authentication. *Id.* at ¶39. All of the technological security measures that Semper Foods implements within its offices are also in place when an employee uses a company laptop to remotely connect to Semper Foods' systems. *Id.* Semper Foods also uses physical security at its offices to protect its proprietary, confidential and trade secret information, such as security guards

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

at the building entrance, key cards to access internal workplaces, closed-circuit video monitoring, logs and escorts for all visitors, and password-protected workstations. *Id.* at ¶40.

**E.   Ouellette is Expelled as a Member of Semper Foods and Removed as an Officer for "Cause".**

Despite Ouellette's unequivocal restrictive covenants, contractual obligations, and statutory fiduciary duties to Semper Foods, he repeatedly violated the Operating Agreement; and he was both disloyal and dishonest towards the company.  *See* Compl. at ¶41.

1.   Ouellette Lies About his Gambling Issues.

As early as April 2020 and subsequently thereafter, Ouellette repeatedly acknowledged to Semper Foods' that his personal gambling habits posed a significant risk to the company. *Id.* at ¶42.   He also affirmatively recognized that his gambling history exposed Semper Foods to additional scrutiny from financial institutions and potentially jeopardized the company's ability to secure funding—which it ultimately did. *Id.* at ¶43. In fact, Ouellette went so far as to instruct Julia Furman, Semper Foods' Director of Human Resources & Accounting, to hide certain pages of his tax return reflecting gambling income or losses when delivering same to lenders in furtherance of one or more loans or credit lines that Semper Foods was attempting to obtain. *Id.* at ¶44.

On October 8, 2022, Ouellette confirmed in writing to Geller that he was no longer gambling, and that he was not allowed to gamble because he and his spouse had commingled their finances. *Id.* at ¶45.  This was a bald-faced lie, however; and it was material to Semper Foods. *Id.* at ¶46. In fact, Ouellette stayed at the MGM Grand in Detroit, Michigan, just two days later because he had "some friends in town and we're going to gamble and crash there that night. . ." *Id.* at ¶47.

As of October 15, 2022, Ouellette was still gambling large sums of money with MGM on-line gambling. *Id.* at ¶48. From December 2021 through November 2022, Ouellette communicated

7

with MGM Grand in Detroit, Michigan and confirmed that he was gambling upwards of $10,000 per month. *Id.* at ¶49. Evidence shows that Ouellette engaged in gambling activities on an almost daily basis on his work computer from at least November 2022 through March 2023. *Id.* at ¶50.

He also appears to have taken regular gambling trips such as in February 2023, when he traveled to the Encore Boston Harbor Casino in Massachusetts and gambled during the workweek despite having promised Semper Foods that he was no longer gambling. *Id.* at ¶51. In March 2023, Semper Foods was unable to obtain a Letter of Credit as a result of the gambling that Ouellette had falsely represented to the other Members he no longer engaged in. *Id.* at ¶52.

2. <u>Ouellette Blatantly Violates his Restrictive Covenants</u>.

Unbeknownst to Semper Foods or its other Members, in December 2022, Ouellette had discussions with The Real Good Food Company, Inc. ("**RGF**"), whereby he sought to be hired either as a RGF employee or independent contractor despite already being Semper Foods' Second Vice President and Chief Operating Officer. *Id.* at ¶53. RGF is a food products seller; and many of its products and services overlap with those offered by Semper Foods. *Id.* at ¶54. RGF also targets the same or similar suppliers and vendors as Semper Foods. *Id.*

On December 17, 2022, Ouellette complained to Geller that he needed a second job to fund his desired lifestyle and blamed Semper Foods' capital expenditures on technology. *Id.* at ¶55. In reality, however, Ouellette desired additional income in part to fund his gambling habit. *Id.* at ¶56. He also asked Geller if "as long as I can adequately fulfil my duties with Semper Foods, you don't see a problem with me obtaining secondary employment? Of course it would be a non-compete in the industry *a non-competing industry." *Id.* at ¶57 (typo in original).

On December 26, 2022, Ouellette sent a text to Geller revealing that his "fourth and final interview" with RGF was forthcoming and stated that RGF would make purchases from Semper

Foods once Ouellette began working there. *Id.* at ¶58. Until that time, Ouellette had concealed the true scope of his discussions with RGF. *Id.* at ¶59.

On December 27, 2022—while he was actively attempting to be hired by RGF and without authorization—Ouellette asked one of Semper Foods' procurement resources, Tim Panzeri, for pricing information to send to RGF. *Id.* at ¶60. When he did so, he instructed Mr. Panzeri to "Cc me and tell them to reply all. That way I can take it from there. . ." *Id.* He further asked: "Would you feel [comfortable] saying you could do this, and you can assume I would be heavily involved because this would be a house account. . ." *Id.* at ¶61. Ouellette thereafter informed him that Ouellette was unsure how he could get Mr. Panzeri paid on the account even though Mr. Panzeri would essentially be doing all of the work. *Id.* at ¶62. In this regard, Ouellette was utilizing Semper Foods' procurement resources but did not intend to comply with existing protocol for new accounts; and as a result, intended to personally benefit from the relationship with RGF to the exclusion of Semper Foods. *Id.* at ¶63.

On December 28, 2022, Semper Foods' Members and Officers were scheduled to discuss Ouellette's request. *Id.* at ¶64. Beforehand, however, Ouellette called Geller and Geller informed him that under no circumstances would Semper Foods or its Members permit Ouellette to work for RGF. *Id.* at ¶65. During the call, Lopez also told Ouellette that he was not authorized to moonlight for RGF and expressed his disbelief that Ouellette would even ask to be permitted to work for another company in the same industry. *Id.* at ¶66. Ouellette then became agitated and demanded a salary commensurate with that paid to chief executive officers, which request the Members denied. *Id.* at ¶67.

Notwithstanding the foregoing, Ouellette had secretly received at his personal email address a draft Consulting Agreement from RGF whereby he or his company (not Semper Foods)

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

would become a consultant for RGF. *Id.* at ¶68. Much, if not all, of the foregoing occurred when Ouellette was supposed to be on familial leave after the birth of his child. *Id.* at ¶69.

On January 4, 2023, Ouellette forwarded the agreement from his personal email account to his Semper Foods email address and texted Geller: "just had a lengthy talk with RGF about assigning the consulting contract to semper foods. . ." *Id.* at ¶70. Three days later, Ouellette forwarded a draft agreement with RGF for review for the first time. *Id.* at ¶71. On January 9, 2023—while Semper Foods was merely contemplating doing the business directly with RGF that Ouellette had first attempted to do on his own—Ouellette pressured a Semper Foods employee to provide him with confidential pricing information ahead of a dinner Ouellette had scheduled with RGF. *Id.* at ¶72. Semper Foods later learned that Ouellette had joined RGF for dinner in Orlando, Florida, that night without advising Geller or Lopez. *Id.* at ¶73. It was the first time since Semper Foods began that Ouellette did not submit expenses for reimbursement. *Id.* at ¶74.

On January 13, 2023, Semper Foods entered into a Consultant Agreement with RGF to explore supposedly mutually beneficial capabilities and opportunities (the "**Consultant Agreement**") at Ouellette's behest. *Id.* at ¶75. Both Semper Foods and RGF agreed to strict confidentiality and non-disclosure restrictions governing the exchange of information pursuant to the Consultant Agreement. *Id.* at ¶76. Semper Foods also agreed to certain non-solicitation and non-competition covenants *at RGF's request* and in exchange for receipt of and access to certain RGF information because Semper Foods and RGF were otherwise competitive in the marketplace. *Id.* at ¶77. In fact, Ouellette "assigned" his consulting contract with RGF to Semper Foods only because he was caught trying to moonlight for RGF using Semper Foods' resources. *Id.* at ¶78. The relationship between Semper Foods and RGF was never expected to work, however. *Id.*

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

On January 16, 2023—after Semper Foods and RGF had entered into the Consulting Agreement and despite certain restrictions set forth in Section X of same—Ouellette asked Mr. Panzeri to have one of Semper Foods' vendors respond to a RGF email address that Ouellette had rather than to his Semper Foods email address presumably for an undisclosed side deal that cut out Semper Foods. *Id.* at ¶79. Almost immediately, despite Ouellette's representations otherwise, it became apparent that continuing a relationship with RGF was untenable. *Id.* at ¶80. On January 20, 2023, Ouellette sent an email to Andrew Bennington and others at Semper Foods, as well as its attorney, arguing that Semper Foods should terminate its relationship with RGF based on his claimed concern "of just being associated with them. . . based on how they do business." *Id.* at ¶81. One hour earlier, however, Ouellette had sent proprietary pricing information to RGF. *Id.* at ¶82.

The same day, Ouellette, on behalf of Semper Foods, sent RGF a Notice of Termination of the Consultant Agreement confirming that the Consultant Agreement was terminated effective immediately by mutual agreement and that Semper Foods and RGF had no ongoing obligations to one another. *Id.* at ¶83. Unbeknownst to Semper Foods at the time, Ouellette nonetheless continued working for RGF through an off-the-books consultancy engagement that he had negotiated and agreed to this with RGF's Executive Chairman Bryan Freeman. *Id.* at ¶84. He continued secretly providing services, funneling Semper Foods information to RGF, and likely diverting business from Semper Foods. *Id.* at ¶85. Moreover, despite his ongoing duties as a full time Semper Foods employee, fiduciary, Officer, and Member, Ouellette began devoting significant time to working for RGF. *See id.* at ¶¶85-88.

Throughout January and February 2023, Ouellette continued obtaining Semper Foods pricing and vendor information for use by RGF. *Id.* at ¶86. For example, on January 25, 2023,

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

Ouellette emailed a Semper Foods vendor on behalf of RGF and stated to that vendor that "I am just doing some consulting for RGF" and requested a meeting to discuss purchasing from the vendor. *Id.* at ¶87. And on January 26, 2023, he emailed another Semper Foods supplier on behalf of RGF seeking products and information for RGF's use. *Id.* at ¶88.

Ouellette was acutely aware that his conduct was improper. *Id.* at ¶89. To wit, on January 31, 2023, RGF's Vice President and Controller, Jenn Arduino ("**Arduino**"), copied Ouellette on RGF correspondence to a new vendor using Ouellette's Semper Foods email address and stated that Ouellette should "be reaching out with the documentation we'll need from you to get set up as a vendor in our system." *Id.* at ¶90. Concerned with Semper Foods learning of his improper conduct, Ouellette responded one minute later, asking Arduino to "please delete this email from your recents so that no messages go here! please." *Id.* at ¶91. Likewise, on February 20, 2023, Ouellette asked a subordinate at Semper Foods to provide him with the cell phone number for a Semper Foods chicken products vendor in order to share this information with RGF. *Id.* at ¶92. Ouellette also specifically instructed at least one subordinate at Semper Foods not to discuss the work he was doing or the information he was obtaining with the other Members or Officers of the Company. *Id.* at ¶93. In fact, Ouellette also regularly instructed the head of procurement to not perform work the head of procurement was instructed to perform by another member of Semper Foods while Ouellette was instructing the head of procurement to work for RGF. *Id.* at ¶94.

Ouellette never sought or obtained approval from Semper Foods to share or disclose Semper Foods' information with RGF. *Id.* at ¶95. He similarly was not authorized to utilize Semper Foods employees in furtherance of his own, competitive business activities or for RGF. *Id.* at ¶96. Nor did he seek or obtain approval from Semper Foods to engage in any consultancy engagement

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

with RGF or to otherwise provide any services to or enter into any agreement with RGF. *Id.* at ¶97.

His failure to seek and obtain approval to work for or provide services to RGF before (or at any time thereafter) directly violated Ouellette's obligations under the Operating Agreement. *Id.* at ¶98. And his disclosure of Semper Foods' confidential information to RGF, solicitation of Semper Foods' vendors and employees on behalf of RGF, and work for RGF violated his confidentiality, non-solicitation, and non-competition covenants under the Operating Agreement. *Id.* at ¶99.

**F.   Semper Removes Ouellette as a Member and Officer.**

As a result of Ouellette's breaches of his obligations under the Operating Agreement and his persistent disloyal and dishonest conduct and self-dealing, Semper Foods removed him as an Officer and expelled him as a Member of Semper Foods by unanimous vote of the other Members for "Cause" on April 3, 2023. Compl. at ¶ 100. Semper Foods thereafter repurchased Ouellette's ownership interest in the Company pursuant to the provisions of the Operating Agreement; and as a result, Semper Consulting was no longer a Member of the company thereafter. *Id.* at ¶¶101-02.

**G.   Ouellette Continues His Campaign to Harm Semper.**

Despite contesting Ouellette's removal as an officer and Semper Foods' expulsion as a Member; Ouellette continued, and in fact ramped up, his efforts to compete with or otherwise harm Semper Foods. Compl. at ¶103. For example, on or around May 9, 2023, he called Semper Foods' insurer and misrepresented that he was still an owner of the Company in an attempt to transfer a Company-owned insurance policy into his own name. *Id.* at ¶104. Similarly, Ouellette began coordinating a vindictive campaign to flood Semper Foods' phone lines, email accounts, and LinkedIn messages with fake and irrelevant sales calls and outreaches, including ongoing,

unsolicited calls and written communications from various unrelated entities and countries, including China and Indonesia. *Id.* at ¶105.

While this childish behavior is indicative of Ouellette's nefarious motive and desire to harm Semper Foods by any means necessary, the depth and consistency of this scheme has caused significant disruption and interference to Semper Foods' normal business operations. *Id.* at ¶106. In another particularly infantile display, Ouellette entered the email address for one of Semper Foods' executives into various online car dealership inquiry forms, resulting in the executive being spammed with unsolicited communications. *Id.* at ¶107.

In addition, despite Semper Foods' demands that Ouellette update his LinkedIn profile, Ouellette refused to remove reference to Semper Foods for multiple months after his removal. *Id.* at ¶108. Semper Foods understands that Ouellette also held himself as an owner and officer of Semper Foods long after expulsion to trade on Semper Foods' name, cause confusion in the marketplace for his benefit and the benefit of others, and to Semper Foods' detriment. *Id.* at ¶109.

**H. Ouellette Joins JAFCO in Violation of His Restrictive Covenants and Interferes with Semper Foods' Other Contracts.**

Ouellette and the other Members engaged in a dialogue regarding potential resolution, which forestalled Semper Foods from immediately initiating litigation including the claims set forth in Semper Foods' Complaint. *See* Compl. at ¶110. During these negotiations, however, Ouellette simultaneously continued his unlawful conduct, and committed new and ongoing breaches of the Operating Agreement. *Id.* at ¶111. Specifically, Semper Foods recently learned that he is now working for and providing services to JAFCO Foods, Inc. d/b/a Curate Foodservice ("**JAFCO**"), in direct violation of his restrictive covenants in the Operating Agreement. *Id.* at ¶112. That was the straw that broke the proverbial camel's back.

14

JAFCO is engaged in the same business as Semper Foods and is a direct competitor. *Id.* at ¶113. Like Semper Foods, JAFCO offers food products to businesses throughout the United States. *Id.* at ¶114. They both operate in the same wholesale protein and dry good food product market. *Id.* at ¶115. And like Semper Foods, JAFCO focuses its business on nationwide institutional clients, including wholesalers, food processors, retailers, and brands, as well as governmental, correctional and educational institutions and systems. *Id.* at ¶116.

Indeed, JAFCO's public website confirms that it operates nationwide and services institutional clients, including corporations, healthcare systems, educational institutions, and food retailers. *Id.* at ¶117. Semper Foods and JAFCO target the same or similar food suppliers and vendors in order to provide products at the most competitive prices to their clients. *Id.* at ¶118.

As such, Ouellette is able to and upon information and belief has used and continues to use Semper Foods' trade secrets and goodwill in furtherance of his employment with JAFCO. *Id.* at ¶119. With his intimate knowledge of Semper Foods' confidential information and trade secrets, Ouellette can immediately use and likely has already used this information to solicit Semper Foods' clients by undercutting Semper Foods pricing and by leveraging Semper Foods' vendor and supplier network. *Id.* at ¶120. Moreover, his employment with and provision of services to JAFCO is an unequivocal breach of the Operating Agreement and poses an immediate risk of irreparable harm to Semper Foods' business. *Id.* at ¶121.

In addition to his own ongoing breaches, Ouellette and JAFCO are actively working together to interfere with Semper Foods' contractual rights and to otherwise harm Semper Foods. *Id.* at ¶122. By way of example, Ouellette recently assisted with JAFCO's solicitation and hiring of a former Semper Foods employee, Jacob Fournier-Williams ("**Fournier-Williams**") in violation of Fournier-William's own non-compete agreement with Semper Foods. *Id.* at ¶123.

Ouellette's solicitation of Fournier-Williams on behalf of JAFCO constitutes independent violations of the Operating Agreement and applicable law. *Id.* at ¶124.

## III.   ARGUMENT

### A.  Standard for Preliminary Injunctive Relief.

"A party that seeks a preliminary injunction must establish that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs the damage the proposed injunction may cause the opposing party; and (4) if issues, the injunction will not be adverse to the public interest." *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011) (internal quotation omitted). Semper Foods easily establishes all necessary elements here.

### B.  There is a Substantial Likelihood of Success on the Merits.

Likelihood of success on the merits "is generally the most important of the four factors." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (quoting *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020)). This first factor "requires a showing of 'only *likely* or probable, rather than *certain*, success.'" *Messina v. City of Ft. Lauderdale, Fla.*, 546 F. Supp. 3d 1227. 1237 (S.D. Fla. 2021) (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F. 3d 1223, 1232 (11th Cir. 2005) (emphasis in original). Semper Foods makes such a showing with regards to its claims for breach of contract and for Ouellette's trade secret misappropriation.

#### 1.  Breach of Contract

To prevail on a claim for breach of contract, Semper Foods must establish "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.,* 564 F. 3d 1256, 1272 (11th Cir. 2009). Semper Foods unquestionably does so here. *See* Compl. at ¶¶19-26, 41-99, 103-126. Whether Semper Foods has a likelihood of

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

success on the merits of its claim for breach of contract accordingly turns on whether its Operating

Agreements' restrictive covenants are enforceable. They unquestionably are.

"Under Florida law, claims for breach of a restrictive covenant are governed by 'Fla. Stat.

§ 542.335, which contains a comprehensive framework for analyzing, evaluating and enforcing

restrictive covenants contained in employment contracts.'" *Transunion Risk & Alternative Data*

*Sols., Inc. v. Challa,* Case No. 9:15-CV-81049, 2016 WL 1161219, at *4 (S.D. Fla. Mar. 23, 2016)

(quoting *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230–31 (11th Cir. 2009)).

Restrictive covenants are accordingly enforceable so long as (1) such contracts are reasonable in

time, area, and line of business; (2) the covenant is set forth in a writing signed by the party at

issue; (3) there are one or more legitimate business interests to justify the covenant; and (4) that

the covenant (and the restraint specified therein) is reasonably necessary to protect those legitimate

business interests. *See* Fla. Stat. § 542.335(1) (2023). The restrictive covenants in Semper Foods'

Operating Agreement meet all four requirements.[2]

> i.  *The Restrictive Covenants are Reasonable in Temporal Scope, Geographic Location, and Business Line.*

The restrictive covenants here run for 18 months after Ouellette's separation from Semper

Foods. *See* Compl. at Ex. "A," p. 14. A two-year restrictive covenant is presumptively reasonable

under Florida law; and Florida courts have long-recognized limitations like the 18-month

restriction here as reasonable. *See Head Kandy, LLC v. McNeill,* 2023 WL 6309985, at *7 (S.D.

Fla. Sept. 12, 2023); *see also Southernmost Foot and Ankle Specialists, P.A., v. Torregrosa,* 189

So. 2d 591, 594-95 (Fla. 3d DCA 2004); *Sentry Ins. v. Dunn*, 411 So. 2d 336, 337 (Fla. 5th DCA

---

[2] The restrictive covenants Semper Foods seeks to enforce are contained in its written Operating
Agreement. *See* Comp. at Ex. "A."

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

1982); *Temporarily Yours-Temporary Help Services, Inc. v. Manpower, Inc.,* 377 So. 2d 825, 827 (Fla. 1st DCA 1979).  No compelling reason exists here to deviate from long-standing precedent.

With regards to geographic scope, the reasonableness " is a factual matter to be determined in each case." *Orkin Exterminating Co., Inc. v. Girardeau*, 301 So. 2d 38, 40 (Fla. 1st DCA 1974). Here, the geographic scope is nationwide. *See* Compl. at Ex. "A," p. 15. "A nationwide restriction is not invalid per se" so long as it is "necessary to protect the employer's interests." *Auto Club Affiliates, Inc. v. Donahey*, 281 So. 2d 239, 241 (Fla. 2d DCA 1973); *accord Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1307–08 (S.D. Fla. 2004) (reasonable to restrict competition in any geographic space in which former employer operates); *Env't Servs., Inc. v. Carter*, 9 So.3d 1258, 1264 (Fla. 5th DCA 2009) (global restriction is reasonable as long as the covenant is not being used to eliminate all competition); *see also Head Kandy*, LLC, 2023 WL 6309985, at *8 (enforcing worldwide restriction).  Courts "have held that the area necessary for the protection of the employer's interests is the area throughout which the employer's business activities extend." *Id.*

Here, the nationwide scope reasonably tailored because Ouellette founded Semper Foods, was its former Chief Operating Officer and Second Vice President, and because Semper Foods markets its good throughout the United States. *See id.* at ¶¶10-12, 28-29. Semper Foods provided Ouellette with its confidential information concerning its clients, vendors, suppliers, and pricing information throughout the United States. *Id.* at ¶¶ 13-15, 30-33. Moreover, Ouellette performed services for Florida-based Semper Foods at times remotely from his home in Michigan and is now performing services for Massachusetts-based JAFCO. *Id.* at ¶¶ 2, 112. Regardless of Ouellette's location, he has can target Semper Food' national customer base and nationwide vendor and supplier network. As such, the nationwide restrictive covenants in Semper Foods' Operating

Agreement protects Semper Foods' interests because its business activities extend throughout the United States.

Ouellette's noncompetition covenant is also narrowly tailored to restrict Ouellette from performing services only for a person or entity "that directly competes with Semper Foods' principal business operations as a food broker." Compl. at Ex. "A," pp. 14-15. He is prohibited from performing services for Semper Foods' competitors, not competition *per se*. *Id.*  A restrictive covenant that is narrowly tailored to the specific line of business, as here, is reasonable. *See All Star Recruiting Locums, LLC v. Ivy Staffing Sols., LLC*, 2022 WL 2340997, at *14 (S.D. Fla. Apr. 8, 2022) (upholding restrictive covenant specifically limited to plaintiff's business). Such limited restrictive covenants "[do] not prevent employees engaging in activity outside of the industry" and are thus enforceable. *Id.; see also Milner Voice & Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209, 1219 (S.D. Fla. 2005).

> ii.   *Legitimate Business Interests Justify the Restrictive Covenants.*

A "legitimate business interest" is an "identifiable business asset that constitutes or represents an investment by the proponent of the restriction such that, if that asset were misappropriated by a competitor (i.e., taken without compensation), its use in competition against its former owner would be 'unfair competition.'" *White v. Mederi Caretenders Visiting Services of Southeast Fla., LLC,* 226 So. 3d 774, 784 (Fla. 2017) (quotation omitted). "Put another way, a 'legitimate business interest' is a business asset that, if misappropriated, would give its new owner and unfair competitive advantage over its former owner." *Id.* at 784-85 (quotation omitted).

"Legitimate business interests" include (1) trade secrets [as defined in the FUTSA], (2) confidential business information that is not otherwise protectable as a trade secret, (3) substantial relationships with prospective or existing clients, (4) client goodwill, and (5) extraordinary or

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

specialized training. *See* Fla. Stat. § 542.335(1)(b)*; All Star Recruiting Locums, LLC*, 2022 WL

2340997 at *13. Moreover, the "right to prohibit the direct solicitation of existing customers' is a

legitimate business interest, and a covenant not to compete which includes a non-solicitation clause

is breached when a former employee directly solicits customers of his former employer." *Kova*

*Commercial of Naples, LLC v. Sabin*, Case No. 2:23-CV-614-JES-KCD, 2023 WL 6458845, at *9

(M.D. Fla. Oct. 4, 2023) (quoting *Atomic Tattoos, LLC v. Morgan*, 45 So.3d 63, 65 (Fla. 2d DCA

2010)).

     "It is clear that [Semper Foods'] [c]onfidential [i]nformation is a protectible legitimate

business interest." *Lincare, Inc. v. Markovic*, 2022 WL 18927111, at *6 (M.D. Fla. Nov. 17, 2022);

*see also*. As one of Semper Foods' founders and a "top-level" employee, Ouellette had intimate

knowledge of the company's business model and strategies, as well as had access to its clients,

vendors, and suppliers throughout the United States. Compl. at ¶¶ 13-15, 30-33. Semper Foods

invested significant time and Company resources developing and maintaining its longstanding,

substantial customer relationships. *Id.* at ¶¶13-15. Its customers repeatedly purchase products

through Semper Foods because it has won this hard earned, repeat business from its clients by

providing high quality products and service at extremely competitive pricing. *Id*. The company's

ability to leverage this network by immediately coordinating purchases of specific products from

specific suppliers in order to fill specific client purchasing needs at extremely competitive pricing,

provides its competitive edge in the marketplace. *Id.* at ¶¶13-18

     Ouellette had access to the highest levels of Semper Foods' proprietary, confidential, trade

secret, and competitive business information, including without limitation nationwide customer,

supplier, and vendor information, financial data, business and marketing plans, information

relating to current and future products, strategic planning and implementation, product

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

specifications, custom product needs, customer lists, preferences, purchasing history, costs, profit margins, pricing information, operating procedures, and other forms of proprietary business intelligence and trade secrets. *See id.* at ¶¶13, 30-31.

This includes Semper Foods' secure, password-protected sales database containing customer identities and contact information, purchase histories and future purchasing needs, pricing information, financial information, and other valuable, confidential customer-related information crucial to servicing Semper Foods' customers, maintaining sales, and maintaining the company's goodwill. *Id.* at ¶¶31-33. Ouellette also had access to other proprietary and confidential information, such as Semper Foods' customers' pricing and product needs, entrusted to it directly by its customers, suppliers, and vendors.  *Id.* at ¶ 32. All of the foregoing is more than sufficient to establish a legitimate, protectible business interest. *See North Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002) (employer has legitimate business interest where employee gains substantial knowledge of his former employer's customers, their purchasing history, and their needs and specifications); *Reliance Wholesale, Inc. v. Godfrey,* 51 So. 3d 561, 564-65 (Fla. 3d DCA 2010) (customer database similar to that which Ouellette had access qualifies as valuable business or professional information).

### iii.    The Restrictive Covenants are Reasonably Necessary.

Restrictive covenants are reasonably necessary when they protect legitimate business interest. *Veterinary Orthopedic Implants, Inc. v. Haas*, 2020 WL 5369087, at *12 (M.D. Fla. Sept. 8, 2020). Ouellette had "access to confidential business information crucial to the success of an employer's business;" and as a result, Semper Foods "has a strong interest in enforcing a covenant not to compete." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1234 (11th Cir. 2009); *accord Pitney Bowes Inc. v. Acevedo*, 2008 WL 2940667, at *3 (S.D. Fla. July 28, 2008)

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

(restrictive covenant reasonably necessary in light of employee's role as a sales director for former employer and his "unfettered access" to former employer's "database and specific client information such as customers' purchasing patterns and expected future needs").

Semper Foods accordingly establishes that the Operating Agreement contains enforceable restrictive covenants that are reasonably necessary to protect its legitimate business interests. It therefore demonstrates a likelihood of success on its breach claim.

### 2. Trade Secrets Misappropriation

To establish misappropriation of trade secrets under the Defend Trade Secrets Act ("**DTSA**"), Semper Foods must show that it possessed a trade secret and Ouellette misappropriated it. *See* 18 U.S.C. § 1839. Similarly, a plaintiff alleging misappropriation of trade secrets under Florida Uniform Trade Secrets Act ("**FUTSA**") must prove "(1) that it possesses a trade secret and took reasonable steps to protect its secrecy; and (2) the trade secret was misappropriated, either by one who knew or had reason to know the trade secret was improperly obtained or who used improper means to obtain it." *Mapei Corp. v. J.M. Field Marketing, Inc.*, 295 So.3d 1193, 1198 (Fla. 4th DCA 2020) (citing Fla. Stat. § 688.002(2) (2020)).

### i. *Semper Foods Clearly Possesses Trade Secrets.*

A trade secret is defined as information that "the owner thereof has taken reasonable measures to keep secret" and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of the information." 18 U.S.C. § 1839(3); *see also* Fla. Stat. § 688.002(4)(a)-(b). Client lists, information, and strategies constitute protectable trade secrets. *See Anchor Title & Escrow, LLC v. Omega Nat'l Title Agency, LLC*, WL 3564942, at *2 (N.D. Fla. Apr. 14, 2023) (customer and client lists were trade secrets); *Freedom*

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

*Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275 (M.D. Fla. 2020) (customer lists and related business information constituted trade secrets); *Pinch A Penny, Inc. v. SR & JG, Inc.*, 9:15-CV-80067, 2017 WL 5763118, at *9 (S.D. Fla. Sept. 19, 2017) (customer list with names, addresses, phone numbers, pool sizes, number of store visits, and purchase history was trade secret). Similarly, know-how and sensitive pricing and financial information is recognized as protectable trade secrets. *See All Star Recruiting Locums, LLC*, 2022 WL 2340997 at *11; *see also Balearia Caribbean Ltd., Corp. v. Calvo*, 2017 WL 8780944, at *6 (S.D. Fla. Aug. 3, 2017) (profit and loss statements may constitute trade secrets if they give competitors a competitive advantage); *Se. Mech. Servs., Inc. v. Brody*, 2008 WL 4613046, at *11 (M.D. Fla. Oct. 15, 2008) (sensitive financial documents are trade secrets).

Here, Semper Foods establishes that it has protectable trade secrets under both the DTSA and FUTSA.[3]  It invested time and human capital, along with ongoing trial and error, developing its prized customer list, along with its vendor and supplier network that allows it to source the high-quality food products nationwide. Compl. at ¶¶13-15. Semper Foods' customer, client, vendor, and supplier lists, networks, and compilations of information (such as specific contacts, preferences, purchasing history, margins, pricing and financial information, and upcoming product needs) are extremely valuable assets compiled over many years and significant investments of time, resources, relationship building.  *Id.* at ¶¶13-18. So, too, is the intimate knowledge that Ouellette necessarily possesses as one of the company's founders and former officer.

Likewise, Semper Foods plainly demonstrates that it took reasonable, and in fact extensive, measures to protect its valuable information and trade secrets. *Id.* at ¶¶19, 34-40; *see also Coihue,*

---

[3]  The DTSA and FUTSA may be analyzed together. *See, e.g.*, *M.C. Dean, Inc. v. City of Miami Beach, Fla.*, 199 F. Supp. 3d 1349, 1353–54 (S.D. Fla. 2016).

**NELSON MULLINS RILEY & SCARBOROUGH** | ATTORNEYS AND COUNSELORS AT LAW
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

*LLC v. PayAnyBiz, LLC*, 2018 WL 7376908, at *5 (S.D. Fla. Feb. 6, 2018) (allegations that plaintiff had confidentiality policies and password-protected computer systems sufficient for to draw a reasonable inference of reasonable steps to protect the secrecy of trade secrets); *Confianca Moving, Inc. v. De Oliveira*, 2011 WL 13269500, at *5 (S.D. Fla. Jan. 24, 2011) (use of restricted computer system accessible by password and confidentiality agreements sufficient to establish reasonable efforts to maintain the secrecy of confidential proprietary information). Semper Foods' client, supplier, and vendor information and pricing and financial information accordingly constitute protectable trade secrets under the DTSA and FUTSA.

   *ii. Ouellette Misappropriated Semper Foods' Trade Secrets and Threatens Continued Misappropriation.*

  A person misappropriates a trade secret by using a trade secret without consent of the owner when he, "at the time of…use, knew or had reason to know that the knowledge of the trade secret was…(I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret…; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy or limited the use of the trade secret." 18 U.S.C. § 1839(5)(B); *see also* Fla. Stat. § 688.002(2).

  Pursuant to the Operating Agreement and as Officer, Member, and fiduciary of the company, Ouellette has contractual and statutory duties not to use or disclose Semper Foods' confidential, proprietary, and trade secret information except in relation to performing his work for Semper Foods. *See* Compl. at Ex. "A," p. 15.

  Ouellette did not adhere to his contractual and statutory obligations regarding the protection of Semper Foods' trade secrets. Without the benefit of discovery, and based on its ongoing investigation, Semper Foods has already uncovered unequivocal evidence that Ouellette

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

transmitted, forwarded, and retained such information, including client, supplier, and vendor contacts and pricing information, for his personal use and for by others outside of Semper Foods. *Id.* at ¶¶53, 59-63, 66-74, 78-79, 82, 84-99, 111-112, 119-124, 128.

Moreover, he already (i) obtained and forwarded confidential and proprietary pricing information for use outside of Semper Foods on multiple occasions; (ii) used Semper Foods' employees and procurement resources to obtain vendor contact information and to send that information to Ouellette's non-company email account (obviously for use other than for Semper Foods); (iii) utilized Semper Foods' confidential pricing information to benefit a competitor; and (iv) repeatedly contacted and solicited vendors under the guise of Semper Foods' business in order to obtain confidential information rightfully belonging to Semper Foods for use by others. *Id.* at ¶¶60-61, 63, 72, 82, 86-88, 92. There is "substantial likelihood that Plaintiff will succeed on its misappropriation claims" because Ouellette sent confidential information from Semper Foods' "database to [his] personal email account while [he was] employed by Plaintiff and without permission from Plaintiff." *All Star Recruiting Locums, LLC, LLC*, 2022 WL 2340997 at *12; *see also AutoNation, Inc. v. Mulleavey*, 2019 WL 4693575, at *4 (S.D. Fla. Aug. 22, 2019) (finding a substantial likelihood of success on a misappropriation claim where the defendant forwarded the plaintiff's customer information to his personal email). Moreover, despite his ongoing contractual and statutory obligations, Ouellette remains in possession of all Semper Foods information stored on his laptop and cellphone. *Id.* at ¶120.

Semper Foods has uncovered Ouellette's misappropriation despite his repeated attempts to conceal his unlawful conduct, including by affirmatively silencing subordinates regarding his theft of information, holding secret meetings with third parties, and instructing individuals to avoid communicating with Ouellette through official Semper Foods channels to prevent Semper Foods

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

from discovering his scheme.  *Id.* at ¶¶72-74, 90-91, 93-94. His well-documented forwarding and disclosing of Semper Foods information—and his attempts to conceal it—establish beyond the pale Ouellette's ongoing and threatened misappropriation for his personal benefit and for the benefit of JAFCO.  To wit, Ouellette has already disclosed inside information regarding Semper Foods personnel to JAFCO and further used this information to solicit and hire a former Semper Foods employee. *Id.* at ¶¶122-124.  He cannot be trusted to adhere to his confidentiality and other obligations intended to protect Semper Foods trade secrets. *Id.* at ¶¶53-99. That he now has decided to work for a <u>direct</u> <u>competitor</u> of Semper Foods while pushing for a pre-suit mediation[4] amplifies both Ouellette's nefarious motive and his ability and intent to use Semper Foods' trade secrets and other confidential information to compete directly with his former company for his benefit and for the benefit of RGF or JAFCO. *Id.* at ¶¶53, 59-63, 66-74, 78-79, 82, 84-99, 111-112, 119-124, 128. Semper Foods accordingly demonstrates a substantial likelihood of success on its claims against the Ouellette under the DTSA and FUTSA, in addition to its claim for breach of its Operating Agreement.

### C.   Irreparable Harm is Presumed.

"[P]reventing irreparable harm in the future is the sine qua non of injunctive relief." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005). "Irreparable harm presupposes an injury that is neither remote nor speculative, but actual and imminent." *Carbone v. Ocean Breeze Recovery, LLC*, 2015 WL 11201203, at *5 (S.D. Fla. Oct. 7, 2015) (quotation

---

[4] Before Semper Foods learned that Ouellette had begun working for JAFCO, his attorney had repeatedly asked Semper Foods to participate in a pre-suit mediation in a purported effort to resolve the issues which arose from Ouellette's and Semper Consulting's ouster from the company. Semper Foods reluctantly agreed; and a mediation was set to occur on October 31, 2023. Semper Foods cancelled same, however, in light of having learned of Ouellette new employment with JAFCO.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

omitted). "In order for an injury to be irreparable, it cannot be undone through monetary remedies." *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1362 (S.D. Fla. 2012).

"The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of the restrictive covenant." *Transunion Risk & Alternative Data Sols., Inc. v. Challa*, 2016 WL 1161219, at *6 (S.D. Fla. Mar. 23, 2016). Similarly, "irreparable injury is presumed when there has been trade secret misappropriation. . ." *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1278 (M.D. Fla. 2020).

Where, as here, a defendant is in possession of plaintiff's confidential and trade secret information and is in a position to utilize them against the plaintiff, the irreparable harm requirement is plainly met. *See Anchor Title & Escrow, LLC v. Omega Nat'l Title Agency, LLC*, 2023 WL 3564942, at *2 (N.D. Fla. Apr. 14, 2023) (defendants' use of proprietary information to solicit customers and clients to a direct competitor risks irreparable harm); *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1363 (S.D. Fla. 2012) (irreparable harm likely when a former employee worked for a competitor and misappropriated trade secrets).

Semper Foods will be irreparably and irreversibly harmed if Ouellette is allowed to continue his unlawful competition and activity in violation of the Operating Agreement, along with his unlawful use and disclosure of Semper Foods' trade secrets and confidential information, in concert with RGF, JAFCO, or otherwise. *Id.* at ¶¶53, 59-63, 66-74, 78-79, 82, 84-99, 111-112, 119-124-126, 128-130.

### D. **The Threatened Injury to Semper Foods Outweighs any Harm to Ouellette.**

The third element of the preliminary injunction test "requires that the movant prove that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant." *All Star Recruiting Locums, LLC,* 2022 WL 2340997, at *18. The Court must therefore

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

"balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*

Entry of an injunction will merely compel Ouellette to abide by his contractual obligations and stop his use or disclosure of Semper Foods' trade secrets and confidential information. The potential harm to Semper Foods outweighs any harm to Ouellette because he will "face only the prospect of being divested of information that [he] had no right to use in the first place, while [Semper Foods] faces loss of its trade secrets, customers, and market share to a competitor, which it has expended significant time and resources to develop and protect." *Anchor Title & Escrow, LLC v. Omega Nat'l Title Agency, LLC*, 2023 WL 3564942, at *3 (N.D. Fla. Apr. 14, 2023). "While the revelation of [Semper Foods'] confidential information and trade secrets would significantly harm [it], all the recommended TRO would do is require [Ouellette] to temporarily abide by the provisions he already agreed to in [the Operating Agreement while the TRO is in place and return any [Semper Foods] property." *WhiteSource Software, Inc. v. Coscina*, 2021 WL 1259215, at *3 (S.D. Fla. Apr. 2, 2021). Ouellette will "not be harmed because he has no legal right to possess [Semper Foods]'s property… and he agreed not to reveal [Semper Foods'] confidential information and trade secrets. . ." *Id.* The balance of the harms thus favors Semper Foods and entry of injunctive relief against Ouellette.

**E.  Granting an Injunction Will Serve the Public Interest.**

The public has an "interest in upholding and protecting freedom to contract and to enforce contractual rights and obligations." *Mohr v. Bank of New York Mellon Corp.*, 393 Fed. Appx. 639, 646 (11th Cir. 2010).  Likewise, "the Florida Legislature has determined that injunctions to protect trade secrets and restrictive covenants serve the public interest." *AutoNation, Inc.*, 2019 WL 4693575, at *5; *see also Seacoast Banking Corp. of Fla. v. Diemer*, 2020 WL 1674309, at *4

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

(M.D. Fla. Jan. 17, 2020) (public interest is served by protection of trade secrets and enforcement of confidentiality agreements). The entry of the preliminary injunction Semper Foods seeks will accordingly "further the public interest by preserving faith in the contractual agreements that businesses routinely make with their employees, by upholding the terms of enforceable contracts, and by rightfully protecting trade secrets from unlawful use and disclosure." *WhiteSource Software, Inc.*, 2021 WL 1259215, at *3 (internal quotations omitted).

A trial court "must specifically articulate an overriding public policy reason if it refuses to enforce a non-compete covenant based on public policy grounds." *Quirch Foods LLC v. Boce,* 314 So. 3d 327, 343 (Fla. 3d DCA 2020) (cleaned up). But Ouellette cannot identify "any such public policy that would substantially outweigh the need to protect the legitimate business interest or interests of [Semper Foods]." *Id.* (cleaned up). There is accordingly no basis not to issue the temporary injunction sought on grounds that doing so will disserve the public interest.

## IV.   CONCLUSION

**WHEREFORE**, Plaintiff, Semper Foods, LLC, respectfully requests that this Court enter a temporary injunction that (a) enjoins Defendant, Eric Ouellette, and all others with actual notice of such injunction from directly or indirectly working for, being employed by, providing services to, or otherwise being involved with the business of JAFCO Foods, Inc., as well as from directly or indirectly soliciting any customer or prospective customer, supplier, vendor, or other business relation of Semper Foods during the pendency of this litigation or otherwise assisting or facilitating the foregoing; (b) upon receipt of actual notice of such temporary injunction, enjoins JAFCO Foods, Inc., its parent company, its subsidiaries, and its affiliates from continuing to directly or indirectly employ Ouellette during the pendency of this litigation; (c) enjoins Ouellette from directly or indirectly accessing, copying, using, or disclosing, any confidential, proprietary, and

trade secret information, whether in physical or electronically-stored form, belonging to Semper Foods; (d) requires Ouellette to immediately return to Semper Foods any physical/hard copy information or property belonging to Semper Foods in his possession, custody or control and further requiring Ouellette, through his counsel, to immediately quarantine any electronically-stored information or property in Ouellette's possession so that Ouellette is unable to access such information or property; and (e) enjoins Ouellette from spoliating, destroying, damaging, altering, disposing, or deleting any information, evidence, or data, whether in physical or electronically-stored format, relevant to or related to this dispute, as well as grants such other and further relief as is deems just and proper.

Dated: October 25, 2023

Respectfully submitted,

**NELSON      MULLINS      RILEY      &
SCARBOROUGH, LLP**
2 South Biscayne Blvd.
21st Floor
Miami, Florida 33131
Telephone: 305.373.9436

By:   */s/ Justin B. Kaplan*
       Justin B. Kaplan, Esq.
       Fla. Bar No.: 33725
       *Justin.Kaplan@nelsonmullins.com*
       George G. Mahfood
       Fla. Bar. No.: 77356
       *George.Mahfood@nelsonmullins.com*

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com