UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-81420-ROSENBERG/REINHART

SEMPER FOODS, LLC,

                            Plaintiff,

v.

ERIC OUELLETTE and SEMPER
CONSULTING, LLC,

                            Defendants.
_____/

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR A PRELMINARY INJUNCTION (ECF NO. 8)

This cause comes before me on Plaintiff's Motion for a Preliminary Injunction. ECF No. 8.  I have reviewed the motion, Defendant Eric Ouellette's response (ECF No. 22), and Plaintiff's reply (ECF No 28), as well as the parties' notices of supplemental authority (ECF Nos. 39, 46, 69) and their proposed findings of fact and conclusions of law (ECF Nos. 65, 66).  I held an evidentiary hearing on January 8, 9, 10, and 17, 2024, and the parties have filed the exhibits that were admitted into evidence.  ECF Nos. 53-58.  For the reasons set forth below, I recommend that Plaintiff's Motion be DENIED.

## BACKGROUND

Plaintiff Semper Foods LLC (Semper Foods), which operates as a food broker and distributor, was founded in 2018 by Defendant Ouellette, Andrew Geller and Jency Lopez, all of whom entered into an Operating Agreement.  *See* Complaint (ECF

No. 1) at ¶¶ 7, 9, 10, Ex. A. In April 2023, Ouellette was removed as an officer of the company, and subsequently went to work for JAFCO Foods, Inc. (JAFCO). *Id.* at ¶¶ 100, 112. In October 2023, Plaintiff brought a five-count Complaint against Defendant Ouellette alleging breach of contract, breach of fiduciary duty, misappropriation of trade secrets under federal and state laws, and tortious interference.[1] The next day, Plaintiff moved for a preliminary injunction alleging that JAFCO is a "direct competitor" and that Ouellette's employment there violates the restrictive covenants in the Operating Agreement. ECF No. 8. Plaintiff's motion seeks to enjoin Ouellette from working for JAFCO and using or disclosing any of Plaintiff's confidential information and trade secrets. *Id.* The motion also seeks an order directing Ouellette to return Plaintiff's property. *Id.*[2]

## FINDINGS OF FACT

*Background of the parties*

Semper Foods is a food broker, trader, distributor, and co-packer that specializes in buying and selling proteins, predominately poultry. Amended Complaint ¶11; Def. Ex. 2; Tr. Vol. 1 at 26:4-5; 120:7-9; Tr. Vol. 3 at 20:17-19, 82:21-

---

[1] Since filing the Motion for a Preliminary Injunction, Plaintiff has amended the Complaint to add a new Defendant, Semper Consulting, LLC, which is owned by Defendant Ouellette. ECF No. 50.

[2] Plaintiff's motion initially sought injunctive relief based on the breach of contract and misappropriation of trade secret claims. ECF No. 8. However, following the evidentiary hearing, Plaintiff submitted proposed Findings of Fact and Conclusions of Law that narrowed the basis for injunctive relief to just the breach of contract claim. ECF No. 65.

23, 105:4-6; Tr. Vol. 4 at 13:6-9.[3] Semper Foods buys both "number one" and "number two" quality foods. Tr. Vol. 1 at 31:19-22, 61:1-5, 64:18-25; Tr. Vol. 3 at 120:17-19, 121:22-23. "Number one" quality foods are produced for a specific customer and must meet that customer's specifications for color, sizing, and other traits. Tr. Vol. 1 at 60:20-22; Tr. Vol. 3 at 89:16-22. "Number two" quality foods are cosmetically imperfect because of slight defects or inconsistencies in quality that do not meet customer specifications. Tr. Vol. 1 at 60:11-16; Tr. Vol. 3 at 89:23-25.

In a typical transaction, a supplier will offer discounted "number two" food products for sale by sending out an email or text message to companies like Semper Foods listing the products available for sale, including a list of code numbers and abbreviated descriptions, the quantity available, and sometimes the price. Tr. Vol. 1 at 120:14-17, 121:1-5, 121:22-23. The prices vary; some suppliers have a pricing model that they set, while others have a pricing model that fluctuates with the market. Tr. Vol 1. at 122:12-123:8. The prices for the food products fluctuate with every transaction, based upon supply and demand and depending on various factors, including the available quantity of the product, the quality of the product, weather, economic volatility. Tr. Vol. 2 at 61:10-19; Tr. Vol. 3 at 122:5-123:3.

After receiving the information from the supplier, Semper Foods then contacts potential customers, provides them with information regarding the available products, and places a bid for the product. Tr. Vol. 3 at 111:19-25; 112:24-113:10;

---

[3] Plaintiff's exhibits are docketed at ECF No. 54, Defendant Ouellette's exhibits are docketed at ECF No. 53, and the transcripts from the four days of testimony are referenced as "Tr. Vol. __" (docketed at ECF Nos. 55-58, respectively).

119:1-18.[4]  After procuring these number two quality food products, Semper Foods resells them to institutions (such as hospitals, prisons, and colleges), as well as a variety of other customers including food banks, sports venues, casinos, retail establishments, large corporations, and other brokers and distributors.  Def. Ex. 3; Tr. Vol. 1 at 56:6-57:2, 58:21-59:3, 59:20-25; Tr. Vol. 3 at 121:5-23; Tr. Vol. 4 at 29:16-19.  Semper Foods' sales to some of these establishments are done indirectly through a distributor.  Tr. Vol. 1 at 58:13-16, 59:13.[5]  Semper Foods' costs and profit margins vary, based on the market, and vary from transaction to transaction.  Tr. Vol. 1 at 41:9-21; Tr. Vol. 4 at 28:2-29:6.

Semper Foods is headquartered in Boca Raton, Florida.  Pl. Ex. 2 at 2; Tr. Vol. 3 at 109:11-13.  The company was formed in February 2018 by Defendant Ouellette, Jency Lopez, and Andrew Geller.  Pl. Ex. 2 at 1, 5, 21.  According to the Operating Agreement, each owned a 33.33% membership interest in Semper Foods through their respective membership-interest holding companies: Semper Consulting, LLC (Ouellette), Lion Distribution & Trading, LLC (Geller), and Sixten Consultants, LLC (Lopez).  Pl. Ex. 2 at 2, 5; Amended Complaint ¶9.  Geller serves as the president and chief financial officer of Semper Foods, Lopez serves as the first vice-president, and

---

[4] Semper Foods does not have any exclusive relationships or contractual agreements with any suppliers (Tr. Vol. 3 at 126:2-6, 126:22-25); nor, does it have any exclusive relationships or contractual agreements with any customers.  Tr. Vol. 3 at 127:2-4.

[5] Semper Foods does not own any production facilities, storage facilities, delivery trucks, or warehouses, although it leases space in warehouses to hold pre-sold product for customers.  Tr. Vol. 1 at 119:17-120:6; Tr. Vol 3 at 114:10-23; Tr. Vol. 4 at 151:13-21.

Ouellette served as the second-vice president and chief operating officer until his removal in April 2023.  Amended Complaint ¶29; Pl. Ex. 2 at 7.  During his tenure, Ouellette oversaw the procurement department of Semper Foods.  Tr. Vol. 4 at 52:18-19.

Ouellette has more than twenty years of experience in supply chain, distribution, sourcing, and purchasing, the majority of which has been in the food industry.  Tr. Vol. 3 at 86:18-20.  He graduated from Eastern Michigan University in 2010, majoring in industrial distribution supply chain, with a specialization in procurement, and subsequently obtained a graduate degree from Eastern Michigan University.  Tr. Vol. 3 at 86:3-17.  His career began in the United States Marine Corps in 2004, where he served as a "warehouse supply chain administrative type."  Tr. Vol. 3 at 86:25-87:8.  Upon leaving the Marines in 2008, he joined National Food Group, a frozen food distributor which sold mainly to correctional facilities and schools, as a junior buyer purchasing number one quality and number two quality foods.  Tr. Vol. 3 at 87:11-17, 87:25-88:5; 88:25-89:2.  In 2013, Ouellette began working with JAFCO as a senior buyer and subsequently became a vice-president overseeing all procurement for JAFCO.  Tr. Vol. 3 at 98:5-22.

Lopez has worked in the protein brokerage and distribution business for his entire career. Tr. Vol 1 at 27:20-22.  In or about 2012 or 2013, Lopez went to work for JAFCO; he worked there until 2018 when he left to start Semper Foods with Ouellette and Geller.  Tr. Vol. 1 at 32:4-7, 32:14-19.

Geller started in the meat business around the same time as Lopez, whom he

met in 2008.  Tr. Vol. 2 at 99:13-15; Tr. Vol. 3 at 11:23-24.  In 2012, Geller started Lion Distribution & Trading, LLC, which is a meat distributor and trading company. Tr. Vol. 3 at 98:25-99:8.  While working at JAFCO, Lopez introduced Geller to Ouellette.  Tr. Vol. 2 at 99:17-24.

In or around 2016 or 2017, Geller, Ouellette, and Lopez discussed forming their own company, which became Semper Foods.  Tr. Vol. 2 at 100:4-8, 100:23-24. Ouellette would be responsible for buying, Lopez would be responsible for selling, and Geller agreed to fund the new business and provide back-office help.  Tr. Vol. 2 at 101:13-14, 106:4-6.

Pursuant to the Operating Agreement, Geller contributed his personal services, administrative services for operations, a one-year rent-free sublease, and a loan to Semper Foods in the principal amount of $100,000 with a three-year term.  Pl. Ex. 2 at 1.  Geller was primarily responsible for managing the company's finances, which included providing financial assistance to Semper Foods, seeking financing for the company, paying suppliers, and receiving payments from customers.  Tr. Vol. 1 at 128:8-13.

Under the Operating Agreement, Ouellette and Lopez contributed their personal services, customer lists, contacts, relationships, and business practices to Semper Foods.  Pl. Ex. 2 at 1; Tr. Vol. 1 at 49:14-52:12.  Lopez's personal services also included the software that he independently developed, which took the raw data provided by suppliers and transformed it by deciphering abbreviations, adding photographs, customer history, etc.  Tr. Vol. 1 at 35:2-10, 35:20-22, 36:1-5, 37:18-24,

38:20-39:3, 39:21-40:21, 49:9-21, 50:5-13.  Ouellette did not participate in creating the software for Semper Foods' computer system; he is not technologically adept with regards to software and does now know how to write or code software.  Tr. Vol. 2 at 58:14-21; Tr. Vol. 3 at 100:20-101:4.  Ouellette and Lopez were primarily responsible for the day-to-day management, customer development, technological infrastructures, purchasing, sales, and growth of Semper Foods.  Tr. Vol. 3 at 110:25-111:4.

*Semper Foods' Confidential Software*

Prior to joining Semper Foods in 2018, Lopez created a modified, cloud-based software system that combined three different types of systems: a product information management system, which stores product information and traits of those products; an enterprise resource planning system, which contains information regarding costs and expenses; and a customer relationship management system which stores customer contacts, purchasing preferences, profits margins regarding those customers, and customer buying patterns.  Tr. Vol. 1 at 33:18-22-35:10; Tr. Vol. 3 at 101:5-12. He started creating the software system in 2007 and used it while at JAFCO.  Tr. Vol. 1 at 105:19-106:3.

The system takes in the raw data received from suppliers regarding products for sale, fact checks it against product information stored in the system and adds pictures and information regarding the quality of the product, variances in quality, nutrition, and ingredients.  It deciphers, filters, and replaces the suppliers' abbreviated codes with a description of the product, which helps Semper Foods

understand what a particular product is and then market it to its customers better than its competitors.  Tr. Vol. 1 at 37:18-24, 38:20-39:3, 39:21-40:1; Tr. Vol. 2 at 69:10-15.

The data that food suppliers send to Semper Foods, such as pricing information and the weight of the product, is public and not confidential to Semper Foods before it is entered into the software system; in fact, it is distributed to the market on a regular basis.  Tr. Vol. 2 at 59:12-18, 60:18; Tr. Vol. 3 at 112:19-22, 122:13-19, 123:9-18.  The identities of suppliers of number two quality chicken are not confidential and can be found through public websites and Google searches.  Tr. Vol. 4 at 30:21-31:9.  The identity of the customers who want to purchase number two quality chicken are also not confidential.  Tr. Vol. 4 at 31:10-32:3.

The software system allows Semper Foods to anticipate when suppliers will have certain product available so it can make better informed decisions in bidding; by looking at a supplier's historical sales of a product, Semper Foods can determine if the supplier may be willing to reduce its price.  Tr. Vol. 1 at 40:13-19, 121:24-122:6.  The system also stores historical information regarding sales to customers, customers' preferences, items customers have purchased in the past, and prices customers have paid, which allows Semper Foods to increase its profit margins.  Tr. Vol. 1 at 42:6-43:5, 45:10-15.  Lopez gave credible testimony that access to the system and its databases would allow a person to know Semper Food's target profit margins, customer purchasing patterns, and customer preferences, which would enable them to gain market share at Semper Foods' expense.  Tr. Vol. 1 at 44:15-45:2, 72:4-10.

8

Only Ouellette, Lopez, Geller, and Andrew Bennington (Semper Foods' current Chief Operating Officer) were able to download the information contained in Semper Foods' databases.  Tr. Vol. 1 at 69:13-70:17.  Semper Foods has multiple layers to protect its software and information contained in the databases, including strict password management policy for employees and two-step authentication; Semper Foods also requires employees to sign non-compete and non-disclosure agreements.  Tr. Vol. 1 at 68:12-24.

*Operating Agreement's Restrictive Covenants*

The restrictive covenants contained in Article XI of the Operating Agreement provide, in relevant part:

A.  Non-Competition

[D]uring the period that a Member or Authorized Member Representative owns or controls an ownership Interest in [Semper Foods] and for the eighteen (18) month period commencing on the day immediately following the date (the "Termination Date") on which the Member . . . terminates for any reason (the "Exclusionary Period"), no Member or Authorized LLC Member Representative shall, directly or indirectly (a) own invest, manage, operate, control or participate in any manner in the ownership, management, operating or control of any entity, (b) serve as a partner, equity holder, employee, principal, agent, consultant, or otherwise with any other person or entity, or (c) have any financial interest in or relationship with any person or entity, that directly competes with the Company's principal business operations as a food broker (a "Competitive Activity") anywhere in the United States . . .

[D]uring the Exclusionary Period, the Member . . . shall promptly notify the President of the Company. . . in advance in writing (which shall include a description of the activity) of the Member['s] . . . intention to engage in any activity which could reasonably be deemed to be subject to [the] noncompetition provision, and the President shall respond to the Member in writing within ten (10) days indicating the remaining Members' approval or objections to the Member['s] . . . engagement in the activity. . ."

B. Non-Solicitation

[During the Exclusionary Period], no member or Authorized LLC Member Representative shall, directly or indirectly, whether personally or through or on behalf of any other person or entity, solicit any of Company's customers or suppliers who transacted any business with Company within twelve (12) months prior to the Termination Date to engage in any transaction for the sale or purchase of any product or service provided by the Company.

C. Confidentiality

The Members, Authorized LLC Member Representatives and Officers agree that they will not, at any time, whether during the time they are Members or any time thereafter, disclose or use any trade secret, proprietary, or confidential information of the Company …

D. Return of Confidential Information

Each Member . . . agrees that on or prior to the Termination Date . . . the Member will deliver to company, and not keep or deliver to anyone else any and all physical matter including any and all notes, files, memoranda, papers and other documents, containing information regarding the conduct of the business of the Company . . . except that the Member may retain such physical matter that does not contain any trade secret, proprietary, or confidential information as may be allowed with the written permission of the Company.

Pl. Ex. 2 at 15-16.

*Incidents Preceding Ouellette's Removal from Semper Foods*

1. Ouellette's Gambling

In 2020, Semper Foods applied for a line of credit from TD Bank.  Geller credibly testified that the application was denied due to Ouellette reporting substantial income from gambling on his tax return.  Tr. Vol. 2 at 126:13-20, 128:17-

10

23, 132:12-15; Pl. Ex. 10.[6]  Indeed, Ouellette acknowledged in an internal email dated April 9, 2020, that he did not want to disclose his 2019 tax return to TD Bank because it showed approximately $75,000 in gambling winnings, and the loan officer "was [already] really concerned with my previous gambling winnings."  Pl. Ex. 11 at 1. Geller spoke with Ouellette about the situation and Ouellette promised to stop gambling.  Tr. Vol. 2 126:20-21, 128:24-129.

Semper Foods again sought to obtain a credit line from TD Bank in 2021.  Tr. Vol. 2 at 135:23-136:4.  Again, Ouellette expressed concern that the gambling income reported on his tax returns would be problematic.  Pl. Ex. 12 at 1; Pl. Ex. 13 at 2. Semper Foods was unable obtain a credit line from TD Bank in 2021.  Tr. Vol. 2 at 136:23-137:1.  In October 2022, Geller again spoke with Ouellette who assured Geller that he was not gambling; Ouellette also sent Geller a text message on October 8, 2022, stating, "I don't gamble anymore," after Geller saw videos Ouellette posted on social media showing him gambling.  Tr. Vol. 2 at 129:5-13; Tr. Vol. 4 at 8:1-25; Pl. Ex. 14.  However, in February 2023, Ouellette gambled at a casino in Boston.  Tr. Vol. 4 at 121:1-20; Pl. Ex. 32.

On March 16, 2023, Geller sent an email to TD Bank inquiring about a line of credit.  Pl. Ex. 44.  In response to that inquiry, TD Bank's loan officer said she had "only one concern based on [Semper Foods'] previous application," namely, Ouellette's

---

[6]  During the evidentiary hearing, the Court took judicial notice, without objection, that "part of the reason the bank turned down the loan was due to Mr. Ouellette's gambling activity."  Tr. Vol. 4 at 103:8-10.

history of "marked gambling." *Id.* The loan officer stated that she "hope[d] this is not an issue any longer since it could be [a] concern for the bank." *Id.* A few hours later, Geller forwarded the email to Lopez and said that the loan officer's response "rule[d] out TD [B]ank" and that they would have to pursue other options. Pl. Ex. 44 at 2.

### 2.   Ouellette's Employment with RGF

On December 26, 2023, Ouellette sent Geller a text message reminding him of a previous conversation where Ouellette had expressed his desire to secure a source of income in addition to Semper Foods. Pl. Ex. 17; Tr. Vol. 3 at 128:14-18. Ouellette advised Geller that he had his fourth and final interview with a frozen food retail manufacturer, The Real Good Food Company, Inc. ("RGF"), to be its Vice President of Procurement. *Id.*[7] RGF wanted Ouellette to help "identify[] product suppliers in order to cut RGF's cost of goods . . ." *See* Ouellette Declaration (ECF No. 22-1) at ¶29. Ouellette wanted to take the position but told Geller he "wouldn't do anything without all three of us being in agreement." Pl. Ex. 17. Geller recalled Ouellette having mentioned the issue previously but was surprised because he "didn't know it was a real thing;" he told Ouellette that they would speak about it the next day. *Id.*; Tr. Vol. 2 at 109:14-21, 110:4-12.

---

[7] RGF manufactures frozen entrees that it distributes to stores such as Walmart and Costco. Tr. Vol. 3 at 127:18-23; Tr. Vol. 4 at 14:1-17. Semper Foods and RGF purchase their proteins from the same suppliers (Tr. Vol. 1 at 74:13-19, 75:6-8), although Ouellette testified that the number one quality protein RGF purchases is not the type that Semper Foods routinely buys. *See* Ouellette Declaration (ECF No. 22-1) at ¶28.

The following day, RGF offered Ouellette the job (Pl. Ex. 16), but Geller told Ouellette that he could "absolutely not" accept the position and that "if . . . any [other] employee was doing what he was doing, they would be fired immediately." Tr. Vol. 2 at 112:1-4, 112:19-23. Ouellette told Bennington that Geller had threatened to sue him for breach of contract, and he asked Bennington never to speak about the situation because it "can get me in huge trouble." Pl. Ex. 16. Nevertheless, on January 4, 2023, Ouellette obtained a draft consulting agreement from RGF. Pl. Ex. 18; Tr. Vol. 2 at 113:15-17.

On January 6, 2023, Ouellette texted Geller: "[J]ust had a lengthy talk with RGF about assigning the consulting contract to [S]emper [F]oods. . ." Pl. Ex. 46. Ouellette advised Geller and Lopez that instead of him working directly for RGF, there was now an opportunity for Semper Foods to provide RGF with procurement and purchasing services for a fixed monthly fee. Tr. Vol. 1 at 76:7-21; Tr. Vol. 2 at 115:19-20, 115:25-116:2. Geller and Lopez agreed to the arrangement, and on January 13, 2023, Semper Foods and RGF entered into a Consulting Agreement. Pl. Ex. 20. The relationship lasted only one week. Tr. Vol. 1 at 77:5; Tr. Vol. 2 at 120:10-11. Almost immediately, Ouellette complained to Geller, Lopez, and Bennington that RGF was "unorganized and sloppy" with "serious internal problems," and by the fourth day of the engagement, Ouellette said RGF was a "disaster" and that "a long-term partnership is just not possible." Pl. Ex. 48 at 1, 2, 6, 8. Ouellette recommended terminating the Consulting Agreement, which Semper Foods did on January 20, 2023. Pl. Ex. 22, 23; Tr. Vol. 1 at 81:17-25; Tr. Vol. 2 at 120:7-11. Despite

recommending that Semper Foods terminate its relationship with RGF and being aware that Semper Foods would not permit him to work for RGF alone, Ouellette nonetheless continued to work for and be paid by RGF after Semper Foods terminated the Consulting Agreement.  Tr. Vol. 4 at 128:18-129:9, 140:23-141:1, 141:16-142:5; Ouellette Dec. at ¶32.

Lopez suspected that Ouellette's plan all along had been to work directly with RGF, so in February 2023, he began investigating Ouellette's online activities.  Tr. Vol. 1 at 82:8-15, 93:19-23.  The investigation revealed that Ouellette had disclosed to RGF pricing information that a supplier had offered to Semper Foods, which risked Semper Foods' ability to make a profit from the sale of that product.  Tr. Vol. 3 at 78:18-23, Pl. Ex. 21.  Semper Foods learned that Ouellette (i) had introduced RGF to one of Semper Foods' important supply contacts, (ii) was procuring product for RGF from Semper Foods' suppliers and had used at least one Semper Foods' employee to do so, and (iii) had attempted to conceal his continued employment with RGF.  Tr. Vol. 1 at 90:9-14, 92:1-11, 93:7-9, 94:13-14; Tr. Vol. 3 at 79:12-80:14; Tr. Vol. 4 at 143:17-24; Pl. Ex. 24, 25.

*Ouellette's Removal from Semper Foods*

On April 3, 2023, Semper Foods, Geller, and Lopez removed Ouellette as an officer of Semper Foods, expelled Semper Consulting as a member of Semper Foods, and purported to purchase Semper Consulting's membership interest in Semper Foods for $1.00 pursuant to a Written Consent of the Qualified Members of Semper Foods, LLC.  Def. Ex. 28, pp. 1-3; Tr. Vol. 4 at 4:6-5:6.

14

Article VIII, Section D, of the Operating Agreement provides that a member may be expelled (and an officer may be removed from office) only for "cause" and only if approved by a unanimous vote of the non-expelled/removed members.  Pl. Ex. 2 at 8.

"Cause" is defined in Article VIII, Section D, of the Operating Agreement as:

> (1) the Member, the Authorized LLC Member Representative or Officer's commission of an act of fraud, theft or dishonesty against the Company or any of the other Members;
>
> (2) the Member, the Authorized LLC Member Representative or Officer's conviction (or plea of nolo contender) to any felony or any misdemeanor involving moral turpitude or that might, in the reasonable opinion of all other members, cause the Company public embarrassment;
>
> (3) a Member or Authorized LLC Member Representative's (i) filing or consenting to the filing or commencement of a petition or other proceedings seeking reorganization, liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency, (ii) the appointment of a receiver, liquidator, assignee, trustee, or other similar official for itself or for a substantial part of its property, (iii) making an assignment for the benefit of creditors, or (iv) admitting in writing its inability to pay its debts generally as they become due;
>
> or
>
> (4) a member or Authorized LLC Member Representative's violation of the Non-Compete Provisions of this Agreement . . .

Pl. Ex. 2 at 8.

Article VIII, Section D, further provides that:

> Upon expulsion or removal of a Member for Cause, the remaining members may also elect, by unanimous vote of the remaining Members, to have the Company purchase the expelled Member's Membership Units by paying the expelled Member the balance of

> the expelled Member's Capital Account as reflect on the
> Company's Records as of the date of expulsion.

Pl. Ex. 2 at 8.

The Written Consent provides that the basis for removing Ouellette as an officer of Semper Foods (and removing Semper Consulting as a member of Semper Foods) was that Ouellette had committed numerous acts of fraud or dishonesty against Semper Foods and violated the non-competition provision of the Operating Agreement:

> Eric Ouellette has committed numerous acts of fraud or dishonesty against the Company and the Company's Members, including without limitation, (a) deriving substantial income from gambling activities subsequent to promising the Company's Members that he would not continue gambling because his having reported same as income to the IRS had or would in the future detrimentally effect the Company; (b) participating in the operation of an entity engaged in a Competitive Activity, including without limitation doing so after Ouellette requested authorization from the Company's Members and was rejected; (c) soliciting Company's customers or suppliers that transacted business with the Company within the twelve months prior to the date hereof; and (d) disclosing or otherwise using Company's trade secrets, proprietary, or confidential information in the furtherance of the foregoing.

Def. Ex 28 at 1-3.[8]  With regard to the alleged violation of the non-compete clause, the Written Consent specified that:

> Eric Ouellette has violated the Non-Compete provisions of the Operating Agreement, by, among other things, participating in the operation of an entity engaged in a Competitive Activity, soliciting Company's customers or suppliers that transacted business with the Company within the twelve months prior to the date hereof, and

---

[8]   Although the Written Consent states that Ouellette violated the non-solicitation and confidentiality provisions of the Operating Agreement, these are not bases for removal under Article VIII, Section D.

16

disclosing or otherwise using Company's trade secrets, proprietary, or confidential information in the furtherance of the foregoing.

Def. Ex. 28 at 1-2.

Once he was removed from Semper Foods, Ouellette's access to Semper Foods' computer system, software, and database was cut off.  Def. Ex. 28, pp. 1-3; Tr. Vol. 1 at 125:22-126:4; Tr. Vol. 4 at 4:24-5:1.  Without access to the system, there was no way for Ouellette to download the system. Tr. Vol. 2 at 58:22-59:8; Tr. Vol. 4 at 4:24-5:1.

*Ouellette's Employment with JAFCO*

On August 28, 2023, almost five months after Ouellette was removed as an officer of Semper Foods and Semper Consulting was expelled as a member, Ouellette/Semper Consulting entered into an Independent Contractor Agreement with JAFCO.  Def. Ex. 30; Tr. Vol. 4 at 21:19-22:3.  Semper Foods learned of this arrangement in October 2023.  Tr. Vol. 2 at 145:25-146:1.

Pursuant to the Independent Contractor Agreement, Semper Consulting provides JAFCO with "[s]trategic consulting services as related to the contract feeder, food service management firm & closed distribution space." Def. Ex. 30; Tr. Vol. 4 at 22:7-10.  Ouellette testified that these are references to Compass Group North America ("Compass Group"), a global food service management firm that handles the food operations (cooking and serving food) at venues including corporate dining, healthcare facilities, educational institutions, sports venues, and entertainment venues.  Def. Ex. 31; Tr. Vol. 3 at 90:21-91:18; 92:10-93:8; 93:16-94:9; 95:6-14; Tr. Vol. 4 at 23:3-8; 24:12-13; 25:4-5; 48:14-20.

17

JAFCO has an exclusive contract with Compass Group in that only it (and another distributor in California) can procure and deliver products to facilities where Compass Group prepares and serves food.  Tr. Vol. 3 at 91:19-92:5; Tr. Vol. 4 at 47:20-21; 48:3-4; 48:19-20, 49:22-25.  Approximately 90% of JAFCO's business is derived from sales pursuant to its contract with Compass Group.  Tr. Vol. 4 at 22:14-16; 49:17-18.  Thus, nearly all of the food JAFCO procures is sold to one customer and that customer is contractually obligated to purchase all of its food from JAFCO (or its counterpart in California).

Pursuant to the Independent Contractor Agreement, Ouellette's role as a consultant is to help JAFCO obtain product that Compass Group and its subsidiaries need, maximize JAFCO's sales to Compass Group and its subsidiaries, and maximize JAFCO's profits.  Tr. Vol. 4 at 23:19- 24:4; 25:13-16; 42:6-14, 42:21-22.  Ouellette provides JAFCO with his "knowledge and business practices" to help JAFCO "obtain the materials they need to facilitate successful sales to Compass Group."  Tr. Vol. 4 at 25:13:16, 44:19-22.  Ouellette purchases frozen chicken for JAFCO and he buys it from the same companies that supply Semper Foods.  Tr. Vol. 4 38:9-12, 39:3-6, 39:22-25, 40:5-11, 50:23-51:6.  However, Semper Foods' pricing information is not useful to Ouellette in his consulting for JAFCO.  Tr. Vol. 4 at 28:7-9.  Ouellette's current work at JAFCO is different from what he did for Semper Foods because he is "facilitating sales" to Compass Group, which Semper Foods could never do because of the exclusive contract between JAFCO and Compass Group.  Tr. Vol. 4 26:21-27:1.  Ouellette is not involved with selling to anyone other than Compass Group.  Tr. Vol. 4 at 46:21-24.

Ouellette denies sharing any of Semper Foods' confidential information with JAFCO and Lopez admitted that Semper Foods does not have any evidence that Ouellette solicited any of its customers for JAFCO or shared any of Semper Foods' confidential or proprietary information with JAFCO.  Tr. Vol. 2 at 57:8-22; Tr. Vol. 4 at 27:2-15; *see also* Ouellette Dec. at ¶¶41, 42.  Ouellette credibly testified that if an injunction is entered against him, he would be "essentially unemployable" because nearly all of his experience is in the number two frozen food industry.  Tr. Vol. 4 at 36:13-19; *see also* Ouellette Dec. at ¶46.

*Parties' Claims*

Semper Foods alleges that Ouellette breached the Operating Agreement in numerous ways: by working for a competitor (RGF) without approval and attempting to conceal it, by giving RGF Semper Foods' confidential information, by accepting a position with another competitor, JAFCO, and disclosing Semper Foods confidential information to JAFCO, by soliciting Semper Foods' suppliers on behalf of JAFCO, and by retaining property belonging to Semper Foods.  Semper Foods contends that it is likely to prevail on these breach of contract claims and that it will suffer irreparable harm if Ouellette is allowed to continue working for JAFCO.

In response, Ouellette contends that the restrictive covenants in the Operating Agreement are unenforceable and therefore Semper Foods is unlikely to succeed on its breach of contract claims.[9]  Ouellette also argues that Semper Foods has not

---

[9] In the alternative, Ouellette contends that Semper Foods is not entitled to enforce the Operating Agreement because it engaged in a prior breach.  Ouellette's breach of

established any irreparable injury, and that a balancing of the competing interests (including the public interest) weighs against the entry of an injunction.

## CONCLUSIONS OF LAW

Based on the findings of fact set forth above, the Court makes the following conclusions of law:

### A. Preliminary Injunction Standard

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020) (quoting *Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)).  A court may grant a preliminary injunction when the moving party shows: (1) a substantial likelihood of success on the merits of its claim at trial; (2) irreparable injury will be suffered if the injunction is denied; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the defendant; and (4) an injunction will not be adverse to the public interest.  *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2009).  "A

---

contract counterclaim is based on Semper Foods' payment of $1.00 for Semper Consulting's membership interest, which Ouellette contends was unlawful because Article VIII, subsection D of the Operating Agreement is an unenforceable penalty provision and because Semper Foods did not credit the fair market value of Ouellette's personal services, customer lists, contacts, relationships, or business practices in Ouellette's capital account pursuant to Article IV, Section E of the Operating Agreement.  Ouellette contends that the fair value of his membership interest in Semper Foods as of December 31, 2023 was $2,929,500.00.  Since I find that the restrictive covenants are likely unenforceable, I need not consider Ouellette's counterclaim regarding a prior breach.

20

preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Id.* (citing *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)).  Likelihood of success on the merits "is generally the most important of the four factors." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (citation omitted).

When plaintiffs assert multiple claims as a basis for a preliminary injunction, they "need only establish a substantial likelihood of success on one claim." *Boggs Contracting, Inc. v. Freismuth*, No. 6:21-CV-2088-CEM-EJK, 2021 WL 6755466, at *2 (M.D. Fla. Dec. 27, 2021) (citation omitted).  However, the plaintiff must establish that it is likely to succeed on a claim that is related to the injunctive relief sought; it is axiomatic that a plaintiff's likely success on claims unrelated to the alleged ongoing harm will not justify an injunction. *See Pasquarelli v. Broadway, Inc.*, No. 1:11-CV-316-GZS, 2011 WL 4352371, at *1 (D. Me. Sept. 15, 2011) (plaintiff alleged various disability discrimination and medical privacy claims, but "it is not clear that Plaintiff would be entitled to the injunctive relief [sought, namely, to stop a state eviction proceeding] if he were successful on those claims").  Finally, as the finder-of-fact, the court is "free to accept or reject witness testimony based upon [its] determination as to the witnesses' credibility." *Singhal v. City of Wilton Manors*, No. 06-61653-CIV, 2006 WL 8433166, at *3 (S.D. Fla. Dec. 14, 2006) (making credibility determinations based on testimony offered during hearing on motion for preliminary injunction).

**B. Breach of Contract and Enforceability of Restrictive Covenants**

For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008). To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. *Vega*, 564 F.3d at 1272 (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)).

Under Florida law, "contracts in restraint of trade are generally unlawful." *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 785 (Fla. 2017) (citing Fla. Stat. § 542.18) ("[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful"). Florida Statute § 542.335 creates a limited exception to this general prohibition by "striking a delicate balance between legitimate business interests and a person's inalienable right to work." *White,* 226 So. 3d at 785. The statute permits restrictive covenants as long as they are in writing and are "reasonable in time, area, and line of business." Fla. Stat. §542.335(1).

The statute requires the party seeking enforcement of a restrictive covenant to plead and prove: (1) "the existence of one or more legitimate business interests justifying the restrictive covenant" and (2) that the restrictive covenant "is reasonably necessary to protect the legitimate business interests justifying the restriction." *Id.*

22

at (1)(b)–(c). "A 'legitimate business interest' is a business asset that, if misappropriated, would give its new owner an unfair competitive advantage over its former owner." *White,* 226 So. 3d at 784-85. Legitimate business interests include, *inter alia,* trade secrets, valuable confidential business or professional information, and substantial relationships with customers. Fla. Stat. §542.335(1)(b).[10] However, "[p]rotection against ordinary competition is not a legitimate business interest." *Lucky Cousins Trucking, Inc. v. QC Energy Res. Texas, LLC,* 223 F. Supp. 3d 1221, 1225 (M.D. Fla. 2016). And, "the mere identity of [] clients" or pricing terms "may not be sufficient to justify a restrictive covenant." *Proudfoot Consulting Co. v. Gordon,* 576 F.3d 1223, 1234, n.11 (11th Cir. 2009). "Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." Fla. Stat. §542.335(1)(b).

If the employer can establish its *prima facie* case, the burden shifts to the employee to show that the restriction is overbroad, overlong, or otherwise not reasonably necessary to protect the established interests of the employer. Fla. Stat. §542.335(1)(c). If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests. *Id.*

---

[10] "Trade secret" means information that (a) derives independent economic value from not being generally known or readily ascertainable by people who can obtain economic value from its disclosure or use and (b) for which reasonable efforts are used to maintain its secrecy. Fla. Stat. § 688.002(4).

## C. Semper Foods' Alleged Legitimate Business Interests

In its Amended Complaint, Semper Foods alleges that it has "expended significant financial and human capital to build and maintain its nationwide supplier and vendor network, which it leverages to source and sell high quality food products to customers at competitive prices," and that its "customer, supplier, and vendor information, including without limitation, supplier capabilities, . . . customer needs[,] . . . related pricing, financial information, strategies, and techniques are hard-earned, extremely valuable trade secrets and confidential information that Semper Foods carefully guards against competitors, and that provide the company with a current and future competitive advantage in the marketplace." ECF No. 50 at ¶¶ 16, 17.

In its Motion for a Preliminary Injunction, Semper Foods asserts that its "business model and strategies," as well as its "nationwide customer, supplier, and vendor information, purchasing history, margins, pricing information, [and] operating procedures," all of which are contained in a "customer sales database," constitute confidential, proprietary, and trade secret information. ECF No. 8 at 13-14. Semper Foods contends that its "costs and target profit margins" are also a legitimate business interest, "both on a company-wide basis, and with respect to specific products, customers, suppliers, and vendors" because they are "not publicly known . . . and would [ ] be invaluable to any competitor looking to take Semper Foods' customers and business." *See* Declaration of Jency Lopez (ECF No. 28-1) at ¶ 23; ECF No. 28 at 3.

**D.    Substantial Likelihood of Success on Breach of Contract Claims Related to Ouellette's Employment with JAFCO**

As an initial matter, I note that the Amended Complaint alleges a variety of claims regarding how Ouellette breached the Operating Agreement.  To the extent some of these purported breaches relate to Ouellette's prior work for RGF, I find that they are not relevant to the preliminary injunction sought.  The instant motion seeks to enjoin Ouellette from working with JAFCO and disclosing Semper Foods' confidential information to JAFCO.  Accordingly, only the claimed breaches that arise from Ouellette's present employment are properly before the Court on this motion.  And as to these claims, I find that Semper Foods has not met its burden.

**1.  Semper Foods has not shown that it has a legitimate business interest.**

Semper Foods contends that its "business models and strategies" as well as its "customer, supplier and vendor information, purchasing history margins [and] pricing information" are all confidential information that constitute a legitimate business interest.  But, "simply saying that something is proprietary and confidential does not make it so." *Blue-Grace Logistics LLC v. Fahey*, 653 F. Supp. 3d 1172, 1179 (M.D. Fla. 2023).  And, "[g]eneric allegations" will not suffice.  *Lucky Cousins Trucking, Inc.*, 223 F. Supp. 3d at 1226.

Here, Semper Foods has not met its burden of "articulat[ing] exactly how the information is unique or proprietary [and] explain[ing] how [Ouellette] could unfairly utilize that information to compete against it." *Id.* (denying preliminary injunction where employer identified only generic categories of allegedly confidential

25

information, such as "(a) the most aggressive rates; (b) customer lists and contact information; (c) customer relationship management data (including sales reports, customer revenue activity, sales pipeline reports, and market research); (d) API– approved affiliate policies and procedures, including best practices and customer requirements relating to loading, unloading, hauling, and safety; and (e) proprietary customer billing and affiliate compensation system."); *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1335 (M.D. Fla. 2010) (denying motion for preliminary injunction because employer's "pricing information, customer lists, business plans and proprietary technical data" did not constitute trade secrets or legitimate business interests); *Zodiac Records, Inc. v. Choice Environmental Servs.*, 112 So. 3d 587, 590 (Fla. Dist. Ct. App. 2013) (noting that "former employer's customer relationships do not automatically qualify as trade secrets, even if a party's restrictive covenant attempts to characterize them as such" and "[to] qualify as a trade secret, there must be evidence that a customer list was the product of great expense and effort, that it included information that was confidential and not available from public sources, and that it was distilled from larger lists of potential customers into a list of viable customers for [a] unique business").

With regard to customer information, Semper Foods did not identify any specific customer with whom it has a substantial relationship, much less any customer that Ouellette has poached while working for JAFCO, which would be unlikely given that Ouellette only sells to one customer, Compass Group. *See* Fla. Stat. §542.335(1)(b)(3) (requiring a "substantial" relationship with a "specific"

customer to qualify as a legitimate business interest).  And, as for supplier and vendor information, they are not listed as legitimate business interests in Florida Statute §542.335.  *See also Blue-Grace Logistics LLC*, 653 F. Supp. 3d at 1181–82 ("Vendor and supplier relationships . . . do not generally lend to [] a competitive advantage.").

To the extent Semper Foods contends that its costs and profit margins are legitimate business interests, this information is kept in Semper Foods' software database and the testimony confirmed that Ouellette's access to the database was terminated the day he was removed from Semper Foods.  Lopez testified that there was no way for Ouellette to download the database and Semper Foods failed to show that Ouellette has accessed or shared any of Semper Foods' confidential or proprietary information with JAFCO.  In any event, the record is replete with testimony about the dynamic nature of pricing in this industry and how it is always fluctuating based on market conditions.  Semper Foods has not shown how Ouellette's prior access to this now-stale information would give JAFCO an unfair competitive advantage over Semper Foods.  *Blue-Grace Logistics LLC*, 653 F. Supp. 3d at 1180 (finding employer did not carry its burden on showing that allegedly confidential rate information was still relevant and could lead to an unfair competitive advantage "given fluctuations in the industry").

Finally, Semper Foods acknowledged that the information regarding its suppliers, customers, the product it purchases, and the suppliers' pricing information is all publicly available through websites, internet searches, and on the spreadsheets provided to the market on a regular basis.  Thus, the information that is input into

the software database is not confidential and does not qualify as a legitimate business interest. *See Thyssenkrupp Elevator Corp. v. Hubbard*, No. 2:13-CV-202-FTM-29, 2013 WL 5929132, at *5 (M.D. Fla. Nov. 4, 2013) (court found plaintiff did not establish legitimate business interest where "most of the 'confidential information' identified in the Verified Complaint can be obtained from other sources"); *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304–07 (S.D. Fla. 2004) ("[I]nformation that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection."); *Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 686–87 (11th Cir. 1998) (finding purchaser's process for evaluating amount to bid on a tax deed did not amount to a trade secret, as much of the information used was publicly available and was the same basic method by which any informed buyer would submit an intelligent bid at any auction).

> **2. Semper Foods is not likely to succeed on its claim that JAFCO directly competes with its principal business operation as a food broker.**

Even if Semper Foods could establish that its restrictive covenants protect a legitimate business interest, the evidence does not support a finding that JAFCO qualifies as a competitor. The testimony elicited at the hearing revealed that Semper Foods' principal business as a food broker involves the buying and selling of protein food products, primarily chicken. Semper Foods has distinguished itself in the industry by creating a software database that compiles and refines raw vendor data which allows Semper Foods to target and directly market certain products to specific customers. *See* Lopez Dec. (ECF No. 28-1) at ¶¶16, 17. Knowing the prices

28

historically charged by a supplier, as well as a customer's preferences and what they have paid for certain products in the past, allows Semper Foods to increase its profit margins and succeed in the food brokering industry.

By contrast, the testimony regarding JAFCO's business revealed that it operates in an entirely different manner. Although JAFCO procures its protein from some of the same sources as Semper Foods, the similarity ends there. JAFCO does not engage in the brokering process of identifying buyers who might be interested in the proteins available and negotiating quantities and prices with them. The testimony revealed that 90% of JAFCO's sales (and all of Ouellette's sales for JAFCO) are made to one customer, Compass Group, which is contractually obligated to purchase its food from JAFCO. Thus, a major component of Semper Foods' principal business as a food broker, namely identifying customers in a wide variety of industries who might be interested in the product currently available and determining competitive pricing, does not exist at JAFCO. That Compass Group ultimately uses the food it purchases from JAFCO at a variety of venues similar to those where the products procured by Semper Foods eventually land, does not render these two entities competitors. They do not have a similar business model, or compete for customers, and there was no evidence that Semper Foods and JAFCO ever even bid on the same product from a supplier. For these reasons, Semper Foods is unlikely to prevail on its claim that Ouellette breached the noncompetition provision of the

Operating Agreement by working for JAFCO.[11]

### 3. Semper Foods is not likely to succeed on its claim that Ouellette is violating the non-solicitation provision while working for JAFCO.

The non-solicitation provision of the Operating Agreement prohibits members from soliciting any customers or suppliers who transacted business with Semper Foods within 12 months of the member's termination date. The record is clear that while working for JAFCO, Ouellette only sells to one customer, Compass Group, which was never Semper Foods' customer. Semper Foods did not present any evidence that Ouellette has solicited any of Semper Foods' customers while working for JAFCO.

As for suppliers, Florida Statute §542.335 states that supplier relationships are not a legitimate business interest that can be used to justify enforcement of a restrictive covenant. *See Blue-Grace Logistics LLC*, 653 F. Supp. 3d at 1181–82. In any event, Ouellette credibly testified that he has "never reached out to any manufacturers directly out of respect for my former company." Tr. Vol. 4 at 40:15-16. And, there was no testimony that Ouellette is soliciting suppliers who transacted business with Semper Foods during the year preceding his removal from the company.[12] Accordingly, Semper Foods is not likely to succeed on its claim that

---

[11]   In light of my determination that the present record does not show JAFCO is a competitor, I further find that Semper Foods is unlikely to prevail on its claim that Ouellette breached the Operating Agreement by failing to notify Geller of his intention to work for JAFCO.

[12]   Semper Foods' Proposed Findings of Fact and Conclusions of Law state that Ouellette solicited suppliers "with whom Semper Foods had transacted business

Ouellette's work with JAFCO is in breach of the non-solicitation clause of the Operating Agreement.

### 4. Semper Foods is not likely to succeed on its claim that Ouellette is violating the confidentiality provision while working for JAFCO.

The confidentiality provision of the Operating Agreement prohibits members from disclosing or using any trade secret, proprietary, or confidential information belonging to Semper Foods. Ouellette credibly denied using any information that he obtained from Semper Foods in his current position with JAFCO and Semper Foods has not shown that Ouellette accessed or shared any of its confidential or proprietary information while working with JAFCO. Semper Foods acknowledges that Ouellette's access to the software database and Semper Foods' confidential information was terminated when he was removed from Semper Foods -- long before he began working for JAFCO. Moreover, Semper Foods conducted an extensive investigation of Ouellette's email account, Slack messages, Google Workspace, and password security app, but Semper Foods did not find any evidence that Ouellette retained or sent himself any confidential or proprietary information belonging to Semper Foods. Tr. Vol. 1 at 82:11-83:1; Tr. Vol. 2 at 57:8-22, 80:17-81:1, 131:6-8. The evidence also showed that Ouellette does not have the technological ability to replicate any software system of Semper Foods for JAFCO. For these reasons, Semper Foods is not likely to prevail on its claim that Ouellette is in breach of the

---

*during the restricted period . . .*" (ECF No. 65 at ¶120) (emphasis added), but none of the evidence cited by Plaintiff supports that contention.

Operating Agreement's confidentiality clause while working for JAFCO.

**5.  Semper Foods is not likely to prevail on its claim that Ouellette has retained any of its confidential information.**

The Operating Agreement contains a provision precluding members from retaining "any and all physical matter" containing information "regarding the conduct of the business" of Semper Foods.  Aside from Lopez's testimony that Ouellette "took a bunch of property" that belonged to Semper Foods (Tr. Vol. 1 at 125:11-126:2), there was no evidence presented to support this claim.  In fact, in the proposed Findings of Fact submitted by Semper Foods, the only factual allegation related to the unlawful retention claim was that "Ouellette does still possess certain documents that belong to Semper Foods, including 'Semper branded product specification sheet[s].'"  ECF No. 65 at ¶76.  However, Ouellette credibly testified that these documents were nothing more than "fictitious spec sheet[s]," that were "not real," and were created as a "display example."  Tr. Vol. 3 115:5-116:24, 117:13, 119:19-120:4.  At the evidentiary hearing, I declined to admit these exhibits into evidence and allowed them to be used merely as demonstrative aids.  *Id.* at 117:15-17.  Given the lack of evidence, it is unlikely that Semper Foods will prevail on its claim that Ouellette violated the unlawful retention provision of the Operating Agreement.

**E.  Irreparable Injury**

"A showing of irreparable injury is the *sine qua non* of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation marks and citations omitted). The claimed irreparable injury "must be neither remote nor speculative, but

actual and imminent." *Id*. (quotation marks and citations omitted). "To show irreparable harm, a movant must show that the injury 'cannot be undone through monetary remedies.'" *Anago Franchising, Inc. v. CHMI, Inc.*, No. 09-60713-CIV, 2009 WL 5176548, at *11 (S.D. Fla. Dec. 21, 2009) (citing "*Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). The movant must be "unable to quantify its damages." *Anago Franchising, Inc.*, 2009 WL 5176548, at *14.

Plaintiff argues that the Court should apply the presumption of irreparable harm found in Florida Statute §542.335(1)(j), which states that "the violation of an enforceable restrictive covenant creates a presumption of irreparable injury." I decline to apply this presumption given recent Eleventh Circuit reasoning that a federal court should not apply state law presumptions when deciding whether to grant a preliminary injunction, which is a procedural issue. *See All Star Recruiting Locums, LLC v. Ivy Staffing Sols., LLC*, No. 21-CV-62221, 2022 WL 2340997, at *17 (S.D. Fla. Apr. 8, 2022) (citing *Vital Pharm., Inc. v. Alfieri*, 23 F.4th 1282, 1299 (11th Cir. 2022) (Pryor, J., concurring)). Moreover, applying the presumption at this preliminary stage would be premature, particularly given my determination that Semper Foods is unlikely to succeed in showing that Ouellette's employment at JAFCO violates the Operating Agreement's restrictive covenants.[13]

Applying the federal standard, Semper Foods bears the burden of showing that

---

[13] Moreover, the Florida statute's language suggests that the presumption is inapplicable until the court has made a final determination that a restrictive covenant is enforceable and has been violated.

it will suffer irreparable harm if the injunction is not entered -- that the harm is actual and imminent and cannot be remedied monetarily.  *See, e.g., S. Wine & Spirits of Am., Inc. v. Simpkins,* No. 10-21136-CIV, 2011 WL 124631, at *8 (S.D. Fla. Jan. 14, 2011) ("Since this is a federal diversity action for a preliminary injunction, and a point of federal procedural law is at issue, the burden of proof for irreparable harm must be satisfied under the federal standard [and plaintiff] must therefore offer proof of irreparable harm.").

Semper Foods relies on Article XI, Section E of the Operating Agreement wherein the members acknowledge that "any breach" of the restrictive covenants "will result in irreparable injury to the Company."  Def. Ex. 1 at 15-16.  "Such a contract provision, however, is not alone dispositive of the issue of irreparable harm, and does not insulate a plaintiff seeking a preliminary injunction from the need to prove that it will suffer imminent irreparable injury as a result of the defendant's conduct." *Anago Franchising*, 2009 WL 5176548 at *11 (S.D. Fla. Dec. 21, 2009) (citation and quotations omitted).

Semper Foods' claim of irreparable harm fails because no evidence was presented at the hearing to show that Ouellette still possesses or has used any of Semper Foods' alleged confidential information or trade secrets since his removal in April 2023.  The evidence showed that Ouellette did not—and could not—download Semper Foods' database.  Indeed, Ouellette testified that he could not replicate the database or instruct anyone else on how to do so. Tr.  Vol. 3 at 100:20-101:4.

Moreover, Semper Foods has not shown that Ouellette shared any confidential

or proprietary information with JAFCO or that Ouellette accessed any of Semper Foods' asserted confidential or proprietary information for JAFCO.  Tr. Vol 2 at 57:12-22.[14]  The testimony revealed that the quantity of product available, the quality of the product, and the prices change constantly with each different sale.  Tr. Vol. 2 at 61:10-19; Tr. Vol. 3 at 122:5-123:3; Tr. Vol. 4 at 29:4-11.  Therefore, even if Ouellette had it, this information is not still relevant and could not lead to Ouellette having an unfair competitive advantage.  *See Blue-Grace Logistics LLC*, 653 F. Supp. 3d at 1180 (finding employer did not carry its burden or showing that allegedly confidential rate information was still relevant and could lead to an unfair competitive advantage "given fluctuations in the industry").  In any event, Semper Foods' claim that it is being harmed by Ouellette competing in the marketplace and undercutting its sales and profits fails to establish an injury that cannot be compensated by money.  For all of these reasons, Semper Foods has not met its burden of establishing irreparable harm.

## F.  Balance of Harms

The third element of the preliminary injunction test requires the moving party to show that the injury to the movant outweighs the potential harm that an injunction would cause the opposing party.  *Head Kandy, LLC v. McNeill*, No. 23-CV-60345, 2023 WL 6309985, at *16 (S.D. Fla. Sept. 12, 2023) (citing *Chavez v. Fla. SP Warden*,

---

[14]  At least twice in its Proposed Findings of Fact and Conclusions of Law, Semper Foods contends that Ouellette "admitted" to using its confidential business information while working for JAFCO (ECF No. 65 at ¶¶114, 139), but neither of these paragraphs include citations to the record.

742 F.3d 1267, 1271 (11th Cir. 2014)).   In its Proposed Findings of Fact and Conclusions of Law, Semper Foods argues that the continued "use of [its] confidential information and trade secrets would significantly harm it," whereas "all the requested injunction would do is require Ouellette to temporarily abide by the provisions he already agreed to . . ." ECF No. 65 at ¶148.

As explained above, Semper Foods is not likely to show that Ouellette is using its confidential information while working for JAFCO or that Semper Foods is suffering any other injury by Ouellette's continued employment there.   By contrast, Ouellette credibly testified that if he were unable to work at JAFCO or any other food broker, he would be essentially unemployable.

Balancing these potential harms, I find that the injury to Semper Foods, if any, does not outweigh the damage to Ouellette if a preliminary injunction were granted. *See Future Metals LLC v. Ruggiero*, No. 21-CIV-60114, 2021 WL 1701568, at *19 (S.D. Fla. Apr. 13, 2021) (finding the "potentially far more serious consequences to the Defendant's career and ongoing ability to earn a living in an industry to which he has dedicated his professional efforts for more than a quarter-century" outweighed the potential harm to plaintiff).   *Cf. Head Kandy, LLC v*, 2023 WL 6309985, at *16-17 (balance of harm weighed in favor of entering injunction where plaintiff already lost a substantial number of customers and risked irreparable reputational damage, whereas defendant had other income from an unrelated business and could still earn a living).

### G.  Public Interest

In its motion, Semper Foods contends that an injunction is warranted because the public has an interest in having the terms of enforceable contracts upheld (ECF Nos. 8 at 20-21, 65 at 38-39), but I have found it unlikely that Semper Foods will prevail on its claims that the restrictive covenants are enforceable or that Ouellette breached them while working for JAFCO.  Accordingly, this factor weighs against the entry of a preliminary injunction.

### RECOMMENDATION

For the foregoing reasons, I RECOMMEND that Plaintiff's Motion for a Preliminary Injunction (ECF No. 8) be **DENIED**.

### NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Robin L. Rosenberg, United States District Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**

**DONE AND SUBMITTED** in Chambers at West Palm Beach in the Southern District of Florida, this 6th day of May, 2024.

_____
BRUCE REINHART
United States Magistrate Judge